1

2   ACACIA CORPORATE MANAGEMENT, LLC

3   MICHAEL SCOTT IOANE
    108 East John Street

4   Carson City, Nevada 89706
    **775-331-1185**

5

6

7

8

9                   **THE UNITED STATES DISTRICT COURT**

10                  **EASTERN DISTRICT OF CALIFORNIA**
                              **FRESNO**

11

12  **ACACIA CORPORATE**                    ) **CASE NO.** 1:07-CV-1129 AWI NEW

13  **MANAGEMENT, LLC, MICHAEL**            ) (TAG)
    **SCOTT IOANE;**                        )
14                                          ) **QUIET TITLE PURSUANT TO**
         Plaintiffs,                        ) **BINDING STIPULATED**
15                                          ) **SETTLEMENT & AGREEMENT**
    v.                                      ) **BETWEEN THE PARTIES HEREIN**
16                                          )
    **UNITED STATES OF AMERICA;**           )
17  **STEVEN BOOTH; LOUISE BOOTH;**         )
    **BAKERSFIELD PROPERTIES AND**          )
18  **TRUST COMPANY; ALPHA**                )
    **OMEGA TRUST; ALIGNED**                )
19  **ENTERPRISES TRUST,**                  )
                                            )
20       Defendants.                        )
    _____     )

21                              **STIPULATION**

22          The above captioned matter was filed by Acacia Corporate Management, LLC,

23  and Michael Scott Ioane on August 3, 2007.  The parties who are in agreement with this

24  judgment by stipulation are plaintiffs **ACACIA CORPORATE MANAGEMENT,**

25  **LLC, MICHAEL SCOTT IOANE**; and, defendants **STEVEN BOOTH; LOUISE**

26  **BOOTH; BAKERSFIELD PROPERTIES AND TRUST COMPANY; ALPHA**

27  **OMEGA TRUST; ALIGNED ENTERPRISES TRUST,** hereafter "The Parties".  The

28

*Stip/Judgement*                              1

1

2   Parties signatory herein below freely and voluntarily consent to this judgment by binding

3   stipulation in its entirety, as set forth below, To Wit –

4       1.  "The Parties" signatory hereto stipulate and agree that they have been properly

5   served with the summons and complaint in this action, or consented to or waived said

6   service pursuant to FRCivP, Rule 4(d).  All of "The Parties" consent to the jurisdiction of

7   the Court.

8       2.  "The Parties" expressly recognize Exhibit "**A**" and Exhibit "**B**" true and

9   correct copies of an Alliance Title Report Order No.  15192778136 and litigation report

10  provided by Alliance Title Ref No. 15192778 and dated June 8, 2006,

11  respectively.  These documents accurately represent the transactions between

12  the plaintiffs and defendants as to the properties which are the subject of this

13  action, To Wit, 1927 21st Street, Bakersfield, CA 93301, APN 003-241-05; 5717

14  Roundup Way, Bakersfield, CA 93306, APN 386-140-08; 5705 Muirfield Drive,

15  Bakersfield, CA 93306, APN 387-180-06, hereafter "the property."  "The Parties" agree

16  and stipulate to the fact that Plaintiff Michael Scott  Ioane, as an individual, holds

17  5% ownership in "the property" as of August 2, 2007; and, that Plaintiff Acacia

18  Corporate Management LLC holds 95% ownership interest in "the property."

19

20      3. "The Parties" acknowledge and agree that at the time of each transfer of

21  "the property" reflected in Exhibit "**A**" and "**B**" that there existed no government

22  liens against any of "The Parties" or "the property" which would have disturbed,

23

24  encumbered, impaired, or otherwise interfered with the transfer of "the property"

25  as reflected in Exhibits "**A**" and "**B**."

26      4. "The Parties" acknowledge and agree that at the time of each transfer

27

28

*Stip/Judgment*                                            2

of "the property", as reflected in the attached exhibits, there were and are certain private liens, encumbrances, and mortgages, not of a governmental nature, which existed and currently exist between the parties and other private interests as noted in the attached exhibits which the parties do not contest and which this action and stipulation neither challenges nor contests.

5.  "The Parties" acknowledge and agree that this is the full contents of the stipulated judgment anything to the contrary notwithstanding.

6.  By affixing their respective signatures below "The Parties" attest under penalties of perjury that the forgoing is true and correct and that "The Parties" agree to judgment to be entered as stipulated to herein, each party to bear its own costs and attorney fees.

## <u>QUIET TITLE PURSUANT TO BINDING STIPULATED SETTLEMENT & AGREEEMENT</u>

The above captioned matter came before the Court for consideration by stipulation of "The Parties" based on the stipulated settlement & agreement entered into by "The Parties" signatory hereto, concerning 'the property" which is the subject of this matter —

IT IS HEREBY ORDERED AND DECREED, that:

7.  This "Quiet Title Pursuant to Binding Stipulated Settlement & Agreement" coming before the Court, and the Court having duly considered the matter – "Quiet Title Pursuant to Binding Stipulated Settlement & Agreement" is

1

2   hereby approved; and,

3       1.  Upon stipulation and agreement by "The Parties" signatory to this "Quiet

4   Title Pursuant to Binding Stipulated Settlement & Agreement" thereon "The

5   Parties" are bound to this agreement in its entirety along with all attachments

6

7   thereto.

8       2.  The Court further finds, that based upon the exhibits submitted to the

9   Court along with the "Quiet Title Pursuant to Binding Stipulated Settlement &

10  Agreement" that the material facts so stipulated to by "The Parties" are true and

11

12  correct and not subject to dispute.

13      3.  IT IS FURTHER ORDERED THAT The Clerk shall file this "Quiet Title

14  Pursuant to Binding Stipulated Settlement & Agreement" and mail conformed

15  copies to all parties.

16
    Dated:  _9-25-07_
17

18

19

20              United States District Court Judge, Anthony Ishii

21

22  Stipulated to and entered into by the parties and/or their respective
    representatives.
23

24  Dated:  _9/20/2007_

25  **MICHAEL SCOTT IOANE** By: _____

26

27

28

*Stip/Judgment*

4

1
2   Dated: _9/19/2007_

3
4   **For Acacia Corporate Management, LLC,**

5   **STEVEN F. STUCKER, DIRECTOR,** _____

6

7   **STEVEN BOOTH** _____See attached_____
8   **1201 24th Street, Bakersfield, CA 93301**

9

10
     Dated: _____
11

12

13  **LOUISE BOOTH** _____See attached_____
14  **1201 24th Street, Bakersfield, CA 93301**

15
     Dated: _____
16

17
     **For BAKERSFIELD PROPERTIES AND TRUST COMPANY; ALPHA OMEGA**
18  **TRUST; ALIGNED ENTERPRISES TRUST,**
19

20

21  _____See attached_____
22  Rodney Reed, Trustee

23

24

25                        **CERTIFICATE OF SERVICE**
26

27

28
*Stip/Judgment*                        5

1

2 Dated: _____

3

4 **For Acacia Corporate Management, LLC,**

5 **STEVEN F. STUCKER, DIRECTOR,** _____9/19/07__ See attached

6

7

8 **STEVEN BOOTH** By:

1201 24th Street, Bakersfield, CA 93301

9

10

11 Dated: __9/19/07__

12

13

14 **LOUISE BOOTH** BY: Louise Booth

1201 24th Street, Bakersfield, CA 93301

15

16 Dated: __9/19/07__

17

18 **For BAKERSFIELD PROPERTIES AND TRUST COMPANY; ALPHA OMEGA TRUST; ALIGNED ENTERPRISES TRUST,**

19

20

21

22 _____See attached_____

Rodney Reed, Trustee

23

24

25

26                    **CERTIFICATE OF SERVICE**

27

1   Dated: _____

2

3   **For Acacia Corporate Management, LLC,**

4   STEVEN F. STUCKER, DIRECTOR, _____See attached_____

5

6   **STEVEN BOOTH** _____See attached_____
  **1201 24ᵗʰ Street, Bakersfield, CA 93301**

7

8

9   Dated: _____

10

11   **LOUISE BOOTH** _____See attached_____
  **1201 24ᵗʰ Street, Bakersfield, CA 93301**

12

13

14   Dated: _*7-19-07*_

15

16   **For BAKERSFIELD PROPERTIES AND TRUST COMPANY; ALPHA OMEGA
  TRUST; ALIGNED ENTERPRISES TRUST,**

17

18

19   *Rodney Reed, Trustee*

20   Rodney Reed, Trustee

21

22                   **CERTIFICATE OF SERVICE**

23

24

25

26

27

28

1

2

3

4

5      **It is hereby certified that the attached document was served on the following:
STIPULATED SETTLEMENT;  on September 20, 2007 by depositing true and correct**

6      **copies thereof, enclosed in a sealed envelope with postage fully prepaid, in the United States
mail at Bakersfield, California addressed as follows:**

7

8      Rodney Reed, Trustee
For Bakersfield Properties; Alpha Omega trust;

9      Aligned Enterprises trust
1001 N. Beckley, #108-209

10     Desoto, TX 75115

11     Steven and Louise Booth

12     1201 24th Street
Bakersfield, CA 93301

13

14     Acacia Corporate Management LLC
108 East John Street

15     Carson City, NV 89706

16     Michael S. Ioane
P.O. Box  1403

17     Morgan Hill, CA 95038

18
       United States Attorney General

19     Tenth Street & Pennsylvania
Washington, D.C. 20530

20

21

22              Executed on September 20, 2007.        By:

23                                                         Shelly Olson

24

25

26

*Stip/Judgment*  27                                    6

28

# Alliance Title

**Branch:**
5060 California Ave. 7th Floor
Bakersfield, CA 93309
(661) 321-3388
FAX: (661) 321-3395

## PRELIMINARY REPORT

Title Officer: Donald Mushaney /dm3

**ORDER NO. 15192778-136**

**Ref. No:   15192778**

Acacia Corporate Management LLC
108 East John Street
Carson City, NV 89706
Attn.:  Michael

**Property Address:**

, CA
APN:  **003-241-05-00-3 & 386-140-08-00-8 &**

**387-180-06-00-1**

In response to the above referenced application for a policy of title insurance, this Company reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.  The printed Exceptions and Exclusions from the coverage of said Policy or Policies are set forth in Exhibit B attached.

**Please read the exceptions shown or referred to below and the Exceptions and Exclusions set forth in Exhibit B of this report carefully.  The ~xceptions and exclusions are meant to provide you with notice of matters, which are not covered under the terms of the title insurance licy and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.**  This report (and any supplements hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby.  If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

In the event of cancellation or if the transaction has not closed within 90 days from the date hereof, the rate imposed and collectable shall be a minimum of $360.00, pursuant to Section 12404 of the Insurance code, unless other provisions are made.

The form of policy of title insurance contemplated by this report is:

## CLTA Standard Policy issued by First American Title Insurance Company

Dated as of **June 8, 2006** at 7:30 a.m.

The estate or interest in the land hereinafter described or referred to covered by this Report is:

## A Fee

Title to said estate or interest at the date hereof is vested in:

## Acacia Corporate Management, LLC, a Nevada Limited Liability Company

The land referred to in this Report is situated in the State of California, County of **Kern** and is described as follows:
(See "Legal Description" Exhibit A attached)

## EXHIBIT A

Page No. 2
File No. **15192778-136**

At the date hereof exceptions to coverage in addition to the printed exceptions and Exclusions contained in said policy would be as follows:

# THE FOLLOWING ITEMS AFFECTS PARCEL 1:

1. General and special taxes and assessments for the fiscal year 2006-2007, a lien not yet due or payable.

2. General and special taxes and assessments for the fiscal year 2005-2006.

   First Installment:    $1,682.69 Paid
   Second Installment:   $1,682.68 Paid
   Tax Rate Area:        001-001
   A. P. No.:            003-241-05-00-3

3. The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

4. Water rights, claims or title to water, whether or not shown by the public records.

5. A deed of trust to secure an original indebtedness of $240,000.00 recorded October 2, 1996 , as instrument no. 0196128342 of Official Records.

   Dated:         July 11, 1996
   Trustor:       Steven Booth, Trustee of the Aligned Enterprises Trust dated June 15, 1995
   Trustee:       American Title Insurance Company, a corporation
   Beneficiary:   Reinhilde H. Schwartz, an unmarried woman

   According to the public records, by mesne assignment, the beneficial interest under the deed of trust has been assigned to Robert Bell recorded April 12, 2004 , as instrument no. 0204080420 of Official Records

6. A deed of trust to secure an original indebtedness of $500,000.00 recorded March 7, 2000 , as instrument no. 0200026616 of Official Records.

   Dated:         March 6, 2000
   Trustor:       Alpha Omega Trust, a Trust Agreement, dated The 16th Day of June 1995, whose Trustees are V. Steven and Louise Booth
   Trustee:       World Title Co.
   Beneficiary:   Southern Financial

7. A deed of trust to secure an original indebtedness of $500,000.00 recorded July 19, 2000, as instrument no. 0200087327 of Official Records.

   | Dated: | March 6, 2000 |
   |---|---|
   | Trustor: | Alpha Omega Trust, a Trust Agreement, dated The 16th Day of June 1995, whose Trustees are V. Steven and Louise Booth |
   | Trustee: | World Title Co. |
   | Beneficiary: | Southern Financial |

    Document(s) declaring modifications thereof recorded December 3, 003 , as instrument no. 0203262906 of Official Records.

   According to the public records, the beneficial interest under the deed of trust was assigned to Treble by assignment recorded December 30, 2004 , as instrument no. 0204324067 of Official Records.

8. A federal tax lien in favor of the United States of America, recorded December 22, 2005 , as instrument no. 0205352650 of Official Records.

   | Serial No.: | 265497405 |
   |---|---|
   | Debtor: | Acacia Corporate Management, LLC, a Nevada LLC, as nominee of Bakersfield Properties & Trust Co., as nominee of Aligned Enterprise Trust, as nominee of V. Steven & Louise Q. Booth, as to the parcel of real property described as follows: Parcel 1 of said report |
   | Amount: | $2,009,088.65, and any other amounts due thereunder. |

# THE FOLLOWING ITEMS AFFECTS PARCEL 2 & 2A:

9. General and special taxes and assessments for the fiscal year 2006-2007, a lien not yet due or payable.

10. General and special taxes and assessments for the fiscal year 2005-006.

   | First Installment: | $3,177.94 Paid |
   |---|---|
   | Second Installment: | $3,177.94 Paid |
   | Tax Rate Area: | 001-071 |
   | A. P. No.: | 386-140-08-00-8 |
   | Affects: | Lot 29 of Tract No. 3817 |

Page No. 4
File No. **15192778-136**

11.  Supplemental taxes for the fiscal year 2005 assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

    First Installment:        $150.93 Paid
    Second Installment:    $150.93 delinquent
    Penalty:                       $25.09
    Tax Rate Area:            001-071
    A. P. No.:                    386-140-08-00-8
    Affects:                       Lot 29 Tract No. 3817  (#05-4004312)

12.  Supplemental taxes for the fiscal year 2005 assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

    First Installment:        $489.12 Paid
    Second Installment:    $489.11 delinquent
    Penalty:                       $58.91
    Tax Rate Area:            386-140-08-00-8
    Affects:                       Lot 29 Tract No. 3817 (#05-4004313)

13.  Taxes and assessments levied by the Olcese Water District

14.  The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

15.  Water rights, claims or title to water, whether or not shown by the public records.

16.  An easement for ditches and canals and incidental purposes, recorded June 17, 1892 in Book 3 Page(s) 137 of Deeds.

    In Favor of:    Geo C. Doherty

.    The location of the easement cannot be determined from record information.

17.  An easement for pipelines and incidental purposes, recorded August 8, 1975 in Book 4908 Page(s) 1456 of Official Records.

    In Favor of:    Olcese Water District, a California Water District
    Affects:          reference is made to said document for full particulars

18.  An easement shown or dedicated on the Map as referred to in the legal description

    For:          public utilities, slope, landscape and incidental purposes.
    Affects:     as shown on the recorded map

19.    Covenants, conditions, restrictions and easements in the document recorded December 6, 1976
       in Book 4994 Page(s) 84 of Official Records, which provide that a violation thereof shall not
       defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and
       for value, but deleting any covenant, condition or restriction indicating a preference, limitation
       or discrimination based on race, color, religion, sex, handicap, familial status, national origin,
       sexual orientation, marital status, ancestry, source of income or disability, to the extent such
       covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States
       Codes or Section 12955 of the California Government Code. Lawful restrictions under state
       and federal law on the age of occupants in senior housing or housing for older persons shall not
       be construed as restrictions based on familial status

       An easement as contained in the above document.

       For:         entry and access and incidental purposes.

       The location of the easement cannot be determined from record information.

20.    An easement for facilities and incidental purposes, recorded October 16, 2003 , as instrument
       no. 0203225641 of Official Records.

       In Favor of:   Olcese Water District a public agency it's successor's and/or assigns
       Affects:       reference is made to said document for full particulars

21.    A deed of trust to secure an original indebtedness of $900,000.00 recorded April 28, 2004 , as
       instrument no. 020495746 of Official Records.

       Dated:        April 17, 2004
       Trustor:      Bakersfield Properties and Trust Company
       Trustee:      CJ Investment Services, Inc., a California Corporation
       Beneficiary:  Southern Financial

       According to the public records, the beneficial interest under the deed of trust was assigned to
       Treble, LLC, a California Limited Liability Company by assignment recorded June 11, 2004 ,
       as instrument no. 0204135106 of Official Records.

22. A federal tax lien in favor of the United States of America, recorded December 22, 2005 , as instrument no. 0205352649 of Official Records.

Serial No.:   2654969905
Debtor:       Acacia Corporate Management, LLC, a Nevada LLC, as nominee of Bakersfield Properties & Trust Co., as nominee of Aligned Enterprise Trust, as nominee of V. Steven & Louise Q. Booth, as to the parcel of real property described as follows: Parcel 1 of said report
Amount:       $2,009,088.65, and any other amounts due thereunder.

## THE FOLLOWING ITEMS AFFECTS PARCEL 3 & 3A & 3B:

23. General and special taxes and assessments for the fiscal year 2006-2007, a lien not yet due or payable.

24. General and special taxes and assessments for the fiscal year 2005-2006.

First Installment:    $1,464.76 Paid
Second Installment:   $1,464.75 delinquent
Penalty:              $156.47
Tax Rate Area:        001-071
A. P. No.:            387-180-06-00-1

25. The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

26. Water rights, claims or title to water, whether or not shown by the public records.

27. An easement shown or dedicated on the Map as referred to in the legal description

For:       public utilities, storm drain and incidental purposes.
Affects:   as shown on the recorded map

28.   Covenants, conditions, restrictions, easements, assessments, liens, charges, terms and provisions in the document recorded October 11, 1984 in Book 5701 Page(s) 627 of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, national origin, sexual orientation, marital status, ancestry, source of income or disability, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes or Section 12955 of the California Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

.   Document(s) declaring modifications thereof recorded December 28, 1984 in Book 5721 Page(s) 169 of Official Records and October 17, 1997 , as instrument no. 0197138958 of Official Records

29.   The terms and provisions contained in the document entitled "Club Membership Purchase Agreement and subject to the terms and conditions therein
Recorded:          November 1, 1984 in Book 5707 Page(s) 824 of Official Records

.   Document(s) declaring modifications thereof recorded March 1, 1988 in Book 6098 Page(s) 1673 of Official Records

Reference is made to said Document for full particulars.   .

30.   The terms and provisions contained in the document entitled "Right of Entry Agreement, recorded January 27, 1989 in Book 6204 Page(s) 115 of Official Records

31.   A deed of trust to secure an original indebtedness of $900,000.00 recorded April 28, 2004 , as instrument no. 020495746 of Official Records.

    Dated:        April 7, 004
    Trustor:      Bakersfield Properties and Trust Company
    Trustee:      CJ Investment Services, Inc., a California Corporation
    Beneficiary:  Southern Financial
    Affects:      said land and other properties

According to the public records, the beneficial interest under the deed of trust was assigned to Treble, LLC, a California Limited Liability Company by assignment recorded June 11, 2004 , as instrument no. 0204135106 of Official Records.

Page No. 8
File No. **15192778-136**

32.   A federal tax lien in favor of the United States of America, recorded December 22, 2005 , as
      instrument no. 0205352651 of Official Records.

Serial No.:   265496305
Debtor:       Acacia Corporate Management, LLC, a Nevada LLC, as nominee of Bakersfield
              Properties & Trust Co., as nominee of Aligned Enterprise Trust, as nominee of
              V. Steven & Louise Q. Booth, as to the parcel of real property described as
              follows: Parcel 1 of said report
Amount:       $2,009,088.65, and any other amounts due thereunder.

## REQUIREMENTS:

A.   With respect to **Acacia Corporate Management, LLC, a Nevada Limited Liability
     Company**:

     a.   A copy of its operating agreement and any amendments thereto;
     b.   If it is a California limited liability company, that a certified copy of its articles of
          organization (LLC-1) and any certificate of correction (LLC-11), certificate of
          amendment (LLC-2), or restatement of articles of organization (LLC-10) be recorded in
          the public records;
     c.   If it is a foreign limited liability company, that a certified copy of its application for
          registration (LLC-5) be recorded in the public records;
     d.   With respect to any deed, deed of trust, lease, subordination agreement or other
          document or instrument executed by such limited liability company and presented for
          recordation by the Company or upon which the Company is asked to rely, that such
          document or instrument be executed in accordance with one of the following, as
          appropriate:
          (i)    If the limited liability company properly operates through officers appointed or
                 elected pursuant to the terms of a written operating agreement, such document
                 must be executed by at least two duly elected or appointed officers, as follows:
                 the chairman of the board, the president or any vice president, and any
                 secretary, assistant secretary, the chief financial officer or any assistant
                 treasurer;
          (ii)   If the limited liability company properly operates through a manager or
                 managers identified in the articles of organization and/or duly elected pursuant
                 to the terms of a written operating agreement, such document must be executed
                 by at least two such managers or by one manager if the limited liability
                 company properly operates with the existence of only one manager.
     e.   Other requirements which the Company may impose following its review of the
          material required herein and other information which the Company may require.

## NOTES:

a.      This report does not reflect requests for notice of default, requests for notice of delinquency, subsequent transfers of easements, and similar matters not germane to the issuance of the policy of title insurance anticipated hereunder.

b.      If this company is requested to disburse funds in connection with this transaction, Chapter 598 of 1989 Mandates of the California Insurance Code requires hold periods for checks deposited to escrow or sub-escrow accounts. Such periods vary depending upon the type of check and anticipated methods of deposit should be discussed with the escrow officer.

c.      No endorsement issued in connection with the policy and relating to covenants, conditions or restrictions provides coverage for environmental protection.

d.      Special recordings: Due to a severe budget shortfall, many county recorders have announced that severe limitations will be placed on the acceptance of "special recordings."

e.      Homeowners association: if the property herein described is subject to membership in a homeowners association, it will become necessary that we be furnished a written statement from the said homeowners association of which said property is a member, which provides that all liens, charges and/or assessments levied on said land have been paid. Said statement should provide clearance up to and including the time of closing. In order to avoid unnecessary delays at the time of closing, we ask that you obtain and forward said statement at your earliest convenience.

f.      Demands: This company requires that all beneficiary demands be current at the time of closing. If the demand has expired and a current demand cannot be obtained it may be necessary to hold money whether payoff is made based on verbal figures or an expired demand.

g.      Line of credit payoffs: If any deed of trust herein secures a line of credit, we will require that the account be frozen and closed and no additional advances be made to the borrower. If the beneficiary is unwilling to freeze the account, we will require you submit to us all unused checks, debit vouchers, and/or credit cards associated with the loan along with a letter (affidavit) signed by the trustor stating that no additional advances will be made under the credit line. If neither of the above is possible, it will be necessary to hold any difference between the demand balance and the maximum available credit.

h.      Maps: The map attached hereto may or may not be a survey of the land depicted thereon. You should not rely upon it for any purpose other than orientation to the general location of the parcel or parcels depicted. Alliance Title Company expressly disclaims any liability for alleged loss or damages which may result from reliance upon this map.

SEE RECORD OWNER GUARANTEE

## Exhibit A
## LEGAL DESCRIPTION

All that certain real property in the County of KERN, State of California, described as follows:

Parcel 1: (APN.: 003-241-05)

Lots 11 and 12 in Block 201 of City of Bakersfield, County of Kern, State of California, as per map recorded November 25, 1898 in Book 1 Page(s) 13 and 14 of Maps, in the Office of the County Recorder of said County.

Parcel 2: (APN.: 386-140-08)

Lot 29 of Tract No. 3817, in the City of Bakersfield, County of Kern, State of California, as per map recorded October 25, 1976 in Book 26 Page(s) 151, 152 and 153 of Maps, in the Office of the County Recorder of said County.

Parcel 2A;

A non-exclusive easement to use Lots 52 and 68 as depicted on the map for ingress, egress, open space and drainage purposes.

Except therefrom all oil, gas, minerals and other hydrocarbon substances lying below the surface of said land, but with no right of surface entry, as provided in deeds of record.

Parcel 3: (APN.: 387-180-06)

Lot 4 of Tract No. 4578, Unit B, in the City of Bakersfield, County of Kern, State of California, as per map recorded April 11, 1984 in Book 33 Page(s) 66 and 67 of Maps, in the Office of the County Recorder of said County.

Except therefrom all oil, gas, minerals and other hydrocarbon substances lying below the surface of said land, but with no right of surface entry, as provided in deeds of record.

Parcel 3A:

A non-exclusive easement for ingress, egress and road purpose on, over and across the following described property:

All that portion of Section 14, Township 29 South, Range 29 East, Mount Diablo Base and Meridian , in the City of Bakersfield, County of Kern, State of California, according to the Official Plat thereof , being more particularly described as follows:

Commencing at the Northwest corner of said Section 14; Thence South 00°03'20" West on and along the West line of said Section 14, a distance of 2490.34 feet; Thence South 79°20'56" East, 24.18 feet; Thence North 42°12'28" East, 18.18 feet; Thence North 08°27'33" East, 4.50 feet to the true point of beginning ; Thence (1) South 81°32'27" East, 35.81 feet; Thence (2) South 36°32'27" East, 5.66 feet; Thence (3) South 81°32'27" East, 26.00 feet; Thence (4) South 36°32'27" East; Thence (5) South 81°32'27" East, 45.00 feet; Thence (6) North 53°27'33" East, 16.97 feet; Thence (7) South 81°32'27" East, 108.01 feet to the beginning of a tangent Curve concave to the South having a radius of 100.00 feet; Thence (8) Easterly on and along said curve through a central angle of 13°25'55", an arc distance of 23.44 feet to the beginning of a tangent reverse curve concave to the North having a radius of 766.00 feet; Thence (9) Easterly on and along said curve through a central angle of 36°24'58", an arc distance of 486.86 feet; Thence (10) North 75°28'58" East, 4603 feet to the beginning of a tangent curve concave to the South having a radius of 384.00 feet; Thence (11) Easterly on and along said curve through a central angle of 28°41'30", an arc distance of 192.29 feet; Thence (12) South 75°50'00" East, 46.04 feet to the beginning of a tangent curve concave to the Southwest having a radius of 334.00 feet; Thence (13) Southeasterly on and along said curve through a central angle of 77°22'30", an arc distance of 451.05 feet; Thence (14) South 01°32'30" West, 175.00 feet to the beginning of a tangent curve concave to the Northeast having a radius of 916.00 feet; Thence (15) Southeasterly on and along said curve through a central angle of 29°13'30", an arc distance of 467.23 feet; Thence (16) South 27°41'00" East, 107.84 feet to the beginning of a tangent curve concave to the Northeast having a radius of 416.00 feet ; Thence (17) Southwesterly on and along said curve through a central angle of 54°26'35", an arc distance of 395.29 feet; Thence (18) South 82°07'35" East, 326.44 feet to the beginning of a tangent curve concave to the North having a radius of 291.00 feet; Thence (19) Southeasterly on and along said curve through a central angle of 43°20'39", an arc distance of 220.14 feet; Thence (20) North 54°31'46", 46.86 feet to the beginning of a tangent curve concave to the Southeast having a radius of 257.00 feet; Thence (21) Northeasterly on and along said curve through a central angle of 08°58'27", an arc distance of 40.25 feet to the beginning of a tangent reverse curve concave to the Northwest having a radius of 600.00 feet; Thence (22) Northeasterly on and along said curve through a central angle of 01°03'14", an arc distance of 11.04 feet to the beginning of a tangent reverse curve concave to the Southeast having a radius of 200.00 feet; Thence (23) Easterly on and along said curve through a central angle of 15°29'49", an arc distance of 54.09 feet to the beginning of a compound curve concave to the South having a radius of 259.00 feet; Thence (24) Easterly on and along said curve through a central angle of 41°50'06", an arc distance of 189.11 feet to the beginning of a compound curve concave to the Southwest having a radius of 200.00 feet; Thence )25) Southeasterly on and along said curve through a central angle of 15°29'49", an arc distance of 54.09 feet to the beginning of a reverse curve concave to the Northeast having a radius of 600.00 feet; Thence (26) Southeasterly on and along said curve through a central angle 01°03'14", an arc distance of 11.04 feet to the beginning of reverse curve concave to the Southwest having a radius of 257.00 feet; Thence (27) Southeasterly on and along said curve through a central angle of 05°25'01", an arc distance of 24.30 feet; Thence (28) South 40°21'30" East, 5.85 feet to the beginning of a tangent curve concave to the West having a radius of 20.00 feet; Thence (29) Southerly on and along said curve through a central angle 84°41'42", an arc distance of 29.59 feet to a point of cusp with a curve concave to the Southeast having a radius of 391.00 feet and to which point a radial line bears North 45°39'48" West; Thence (30) Northeasterly on and along said curve through a central angle of 05°18'18", an arc distance of 36.20 feet; Thence (31) North 49°38'30" East, 38.00 feet to a point of cusp with a curve concave to the North having a radius of 20.00 feet and to which point a radial line radial line bears North 40°21'30" West; Thence (32) Northeasterly on and along said curve through a central angle of

90°00'00", an arc distance of 31.42 feet; Thence (33) North 40121'30" West, 4.09 feet to the beginning of a tangent curve concave to the Southwest having a radius of 293.00 feet; Thence (34) Northwesterly on and along said curve through a central angle of 05°25'01", an arc distance of 27.70 feet to the beginning of a compound curve to the Southwest having a radius of 200.00 feet; Thence (35) Northwesterly on and along said curve through a central angle of 12°34'21", an arc distance of 43.89 feet to the beginning of a tangent reverse curve concave to the Northeast having a radius of 600.00 feet whose radial bears North 31°39'08" East; Thence (36) Northeasterly on and along said curve through a central angle of 01°18'07", an arc distance of 13.63 feet to the beginning of a tangent reverse concave to the Southwest having a radius of 291.00 feet; Thence (37) Northwesterly on and along said curve through a central angle of 05°25'56", an arc distance of 27.59 feet; Thence (38) North 27°31'19" East, 0.50 feet to the beginning of a non-tagent curve concave to the Southwest having a radius of 291.50 feet whose radial bears South 27°31'19" West; Thence (39) Northwesterly on and along said curve through a central angle of 28°50'11", an arc distance of 146.71 feet; Thence (40) South 85°19'12" West, 15.07 feet to the beginning of a non0tangent curve concave to the Southwest having a radius of 291.00 feet whose radial bears South 04°16'41" East; Thence (41) Westerly on and along said curve through a central angle of 10°56'52", an arc distance of 55.00 feet to the beginning of a tangent reverse curve concave to the Northwest having a radius of 600.00 feet; Thence (42) Southwesterly on and along said curve through a central angle of 01°18'07" , an arc distance of 13.63 feet to the beginning of a tangent reverse curve concave to the Southeast having a radius of 200.00 feet; Thence (43) Southwesterly on and along said curve through a central angle of 12°34'21", an arc distance of 43.89 feet to the beginning of a compound curve concave to the Southeast having a radius of 293.00 feet; Thence (44) Southwesterly on and along said curve through a central angle of 15°30'47", an arc distance of 79.33 feet to the beginning of a tangent reverse curve concave to the Northeast havinga radius of 201.54 feet; Thence (45) Southwesterly on and along said curve through a central angle of 16°00'34", an arc distance of 56.31 feet to the beginning of a compound curve concave ti the Northwest having a radius of 259.00 feet whose radial bears South 26°00'00" East; Thence (46) Westerly on and along said curve through a central angle of 33°52'25", an arc distance of 153.12 feet; Thence (47) North 82°07'35" West, 326.44 feet to the beginning of a tangent curve concave to the Northeast having a radius of 384.00 feet; Thence (48) Northwesterly on and along said curve through a central angle of 54°26'35", an arc distance of 364.88 feet; Thence (48) North 27°41'00" West, 107.84 feet to the beginning of a tangent curve concave to the Northeast having a radius of 884.00 feet; Thence (50) Northwesterly on and along said curve through a central angle of 29°13'30", an arc distance of 450.00 feet; Thence (51) North 01°32'30" East, 175.00 to the beginning of a tangent curve concave to the Southwest having a radius of 366.00 feet; Thence (52) Northwesterly on and along said curve through a central angle 77°22'30", an arc distance of 494.26 feet; Thence (53) North 75°50'00" West, 46.04 feet to the beginning of a tangent curve concave to the South having a radius of 416.00 feet; Thence (54) Westerly on and along said curve through a central angle of 28°41'30", an arc distance of 208.32 feet; Thence (55) South 75°28'30" West, 46.04 feet to the beginning of a tangent curve concave to the North havinga radius of 734.00 feet; Thence (56) Westerly on and along said curve through a central angle of 37°57'55", an arc distance of 486.36 feet; Thence (57) North 66°33'35" West, 74.82 feet to the beginning of a tangent curve to the Southwest having a radius of 100.00 feet; Thence (58) Westerly on and along said curve through a central angle of 14°58'52", an arc distance of 26.15 feet; Thence (59) North 81°32'27" West, 21.31 feet; Thence (60) North 36°32'27" West, 16.97 feet; Thence (61) North 81°32'27" West, 45.00 feet; Thence (62) South 53°27'33" West, 11.31 feet; Thence (63) North 81°32'27" West, 26.00 feet; Thence (64) South

53°27'33" West, 5.66 feet; Thence (65) North 81°32'27" West, 35.81 feet; Thence (66) South 08°27'33" West, 56.00 feet to the true point of beginning

Parcel No. 3B:

A non-exclusive easement appurtenant to Parcel 3 for access, side yard, encroachment, repairs, replacement, maintenance, overhang, drainage, landscaping, recreation and similar purposes, as defined in Section 2 of the "Declaration of Covenants, Conditions and Restrictions Establishing A Planned Residential Development for Rio Bravo Fairway, Tract 4578", recorded October 11, 1984 in Book 5701 Page(s) 627 of Official Records

APN No: 003-241-05-00-3 386-140-08-00-8 387-180-06-00-1



ASSESSORS MAP NO. 3-24
COUNTY OF KERN

Note : This map is for assessment purposes only. It is not to be construed as portraying legal ownership or divisions of land for purposes of zoning or subdivision laws.



386-14

TRACT 3817

SCHOOL DIST. 1-71

386-14

ASSESSORS MAP NO. 386-14.
COUNTY OF KERN

Note: This map is for assessment purposes
only. It is not to be construed as portraying
legal ownership or divisions of land for
purposes of zoning or subdivision law.

387—18

PTN. WI/2 OF SEC.14 T.29S. R.29E.

TRACT 4578 UN. A

SCHOOL DIST. /—71

387—18

Filed: April 11, 1984



ASSESSORS MAP NO.387—18
COUNTY OF KERN

Note: This map is for assessment purposes only. It is not to be construed as portraying legal ownership or divisions of land for purposes of zoning or subdivision law.

# Alliance Title

## Please call your Escrow Officer if your answer is "Yes" to any of the following questions

- At any time during the preceding 6 months, has there been, or is there currently, any work or construction of improvements on the property?
- Are any of the parties currently vested in title, on the property herein currently Incapacitated or Deceased?
- Are any of the principals of the transaction intending to use a Power of Attorney to execute any of the documentation involved in this transaction?
- Has there been a recent change of marital status of any of the principals involved in this transaction?
- Is the property herein intended to be transferred into a Trust, Partnership, Corporation, or Limited Liability Company?
- Do the sellers of the property reside outside the state of California?
- Will the property described herein be part of a Tax Deferred Exchange?

## In order to better serve you, We ask that you remember:

- All parties signing documents must have a valid Photo Identification Card, Drivers License, or Passport for notarial acknowledgment.
- Please call your Escrow Officer with any Loan or Lien payoff information, if required, he or she may order payoff demands in a timely manner, & advise your Escrow Officer of any loan(s) that are to be assumed by the buyer.
- If parties are obtaining a loan, your Escrow Officer will need to have the Fire/Hazard Insurance, agent name & phone number to add the new lender on the policy as a loss payee.
- If there is to be a change of ownership, it will be necessary for the parties acquiring title to indicate how they would like to be vested. Alliance Title Company has a worksheet available that will briefly explain each of the various methods of holding title (please feel free to request a copy from us). Note: Each method by which you can hold title has different legal &/or tax considerations & parties are encouraged to obtain advise from an Attorney, CPA, or other professional knowledgeable in this area.

**We Are Committed to Safeguarding Customer Information**

In  er to better serve your needs now and in the future, you have provided or will provide us with certain information. We understand that you may be concerned about what we will do with such information – particularly any personal or financial information. We agree that you have a right to know how we will utilize personal information you provide to us.

**Applicability**

This Privacy Policy governs our use of the information that you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity.

**Types of Information**

Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:

- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;

- Information about your transactions with us, our affiliated companies, or others; and

- Information we receive from a consumer-reporting agency.

**Use of Information**

The information you provide us is for our own legitimate business purposes and not for the benefit of any affiliated or nonaffiliated party. Therefore, we will not release your information to affiliated and nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such i  mation indefinitely, including the period after which any customer relationship has ceased. Such information may be used fo. any internal purpose, such as quality control efforts or customer analysis. Furthermore, we may also provide all the information we collect, as described above, to companies that perform marketing services on our behalf, on behalf of our affiliated companies, or to other financial institutions with whom we or our affiliated companies have joint marketing agreements.

**Former Customers**

Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

**Confidentiality and Security**

We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities that need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with the Privacy Policy. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

# Alliance Title

## Notice of Opportunity to Earn Interest

You have the opportunity to earn interest on the funds you deposit with us by instructing us to deposit your funds into an interest bearing account. (You do not have an opportunity to earn interest on any funds deposited by a lender.) If you elect to earn interest, there is an additional fee in the amount of $50.00 for establishing and maintaining such an account. It is important that you consider this cost as it may exceed the actual interest you earn.

**Example:** A regular savings deposit of $1,000.00 at an average interest rate of 3.0%* per annum for a 30 day period:

| Deposit | x | Rate | + | Annual | x | Days | = | Total Interest Earned |
|---------|---|------|---|--------|---|------|---|----------------------|
| $1,000.00 | x | .03 | + | 360 | x | 30 | = | $2.50 |

### PLEASE READ THE FOLLOWING CAREFULLY:

**A.**     If you do not want to have your funds deposited into an interest-bearing account, please initial below this paragraph and return this Notice and such will constitute an instruction to us that your funds be deposited into **Alliance Title Company** general escrow account. Likewise, non-receipt of this form will also constitute an instruction to us that your funds be deposited into **Alliance Title Company** general escrow account.  For important information regarding the general escrow accounts, please read the disclosure in Paragraph C below.

### Initials _____  _____

**B.**     If you elect to have your funds earn interest in an interest-bearing account using **Alliance Title Company** depository bank, you **MUST** sign this form below, and return to **Alliance Title Company** both this signed form and a W-9 form, which can be provided upon request. Please be advised that you will be responsible for reporting all earnings to the applicable taxing authorities.

**C.**     Should you not elect to earn interest on your deposit, your funds will be deposited into our general escrow account at a financial institution insured by the FDIC. The general escrow account is restricted and protected against claims by third parties or creditors of **Alliance Title Company**. This is a non-interest bearing account; however, **Alliance Title Company**, may receive certain financial benefits from that financial institution because of the general escrow account and its on-going banking relationship. These benefits may include, without limitation, credits allowed by such financial institution on loans to **Alliance Title Company** and earnings on investments made with the proceeds of such loans, accounting, reporting and other services and products of such financial institution. We do not have an obligation to account to you in any manner for the value of, or to compensate any party for, any benefit received by **Alliance Title Company**. Any such benefits shall be deemed additional compensation of **Alliance Title Company** for its services in connection with the escrow.

### ELECTION TO EARN INTEREST:

**I HEREBY AUTHORIZE AND DIRECT, Alliance Title Company TO OPEN AN INTEREST BEARING ACCOUNT AT Alliance Title Company DEPOSITORY BANK AND TO CHARGE THE ADDITIONAL FEE FOR THIS SERVICE.**

SIGNATURE: _____     DATE: _____

SIGNATURE: _____     DATE: _____

* Please note that this interest rate is only an example and **Alliance Title Company** does not guaranty the availability of any specific rate.

W   E INSTRUCTIONS: THIS COMPANY WILL BE ABLE TO WIRE FUNDS NECESSARY TO PAY LOANS IN FULL AND/OR PROCEEDS TO ESCROW PROVIDED WE HAVE LENDER PROCEEDS WIRED TO US WHEN THE LOAN FUNDS PRIOR TO RECORDING. THIS WILL ALLOW US THE COLLECTED FUNDS IN OUR ACCOUNT NECESSARY TO WIRE TO YOU. OUR WIRE INSTRUCTIONS ARE:

Bank:            **Centennial Bank**
Routing No.:     **107006981**
Address:         13700 E. Arapahoe Road
                 Englewood, CO 80112
Credit:          Alliance Title Company
Account No.:     **2400619**
Escrow No.:      **15192778**

## PLEASE BE SURE TO REFERENCE OUR TITLE ORDER NUMBER AND TITLE OFFICER.

IF YOU WISH TO HAVE PROCEEDS WIRED TO YOUR ESCROW ACCOUNT PLEASE REQUEST SO AT THE TIME YOU AUTHORIZE THE RECORDING AND VERIFY THAT WE HAVE YOUR CORRECT WIRE INSTRUCTIONS. FOR YOUR CONVENIENCE WE HAVE PROVIDED THE FOLLOWING FORM TO BE FILLED OUT AND FAXED PRIOR TO RECORDING:

-------------------------------------------------------------------------------------------------------------------

A   IANCE TITLE COMPANY

DATE:_____

YOUR ORDER NO. :_____          OUR ESCROW NO.:_____

ON THE ABOVE REFERENCE FILE PLEASE WIRE PROCEEDS TO OUR ACCOUNT. OUR WIRE INSTRUCTIONS ARE:

BANK:_____
BANK ADDRESS:_____
CITY:_____
CREDIT: TO: _____
ACCOUNT NO.: _____
ABA ROUTING NUMBER: _____
SPECIAL INSTRUCTIONS: _____
_____
_____

Note: If you have any documents pertaining to this file please call your title unit or our dispatch department for pickup. Our telephone number is: (661) 321-3388

## EXHIBIT B
### LIST OF PRINTED EXCEPTIONS AND EXCLUSIONS (By Policy Type)

### 1. CALIFORNIA LAND TITLE ASSOCIATION STANDARD COVERAGE POLICY - 1990
### SCHEDULE B

#### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records, Proceedings by a public agency which may result in taxes or assessments, or notice of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims, (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof, (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the public records.

#### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land, (ii) the character, dimensions or location of any improvement now or hereafter erected on the land, (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part, or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge
3. Defects, liens, encumbrances, adverse claims, or other matters.
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant,
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy,
   (c) resulting in no loss or damage to the insured claimant,
   (d) attaching or created subsequent to Date of Policy, or
   ` resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable "doing business" laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by their policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### 2. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY FORM B - 1970
### SCHEDULE OF EXCLUSIONS FROM COVERAGE

1. Any law, ordinance or governmental regulation (including but not limited to building and zoning ordinances) restricting or regulating or prohibiting the occupancy, use or enjoyment of the land, or regulating the character, dimensions or location of any improvement now or hereafter erected on the land, or prohibiting a separation in ownership or a reduction in the dimensions of area of the land, or the effect of any violation of any such law, ordinance or governmental regulation.
2. Rights of eminent domain or governmental rights of police power unless notice of the exercise of such rights appears in the public records at Date of Policy.
3. Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed or agreed to by the insured claimant: (b) not known to the Company and not shown by the public records but known to the insured claimant either at Date of Policy or at the date such claimant acquired an estate or interest insured by this policy and not disclosed in writing by the insured claimant to the Company prior to the date such insured claimant became an insured hereunder. (c) resulting in no loss or damage to the insured claimant, (d) attaching or created subsequent to Date of Policy, or (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.

### 3. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY FORM B - 1970
### WITH REGIONAL EXCEPTIONS

When the American Land Title Association policy is used as a Standard Coverage Policy and not as an Extended Coverage Policy the exclusions set forth in paragraph 2 above are used and the following exceptions to coverage appear in the policy.

#### SCHEDULE B

This policy does not insure against loss or damage by reason of the matters shown in parts one and two following:
Part One:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof
3. Easements, claims of easement or encumbrances which are not shown by the public records.
   Discrepancies, conflicts in boundary lines shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records
   Unpatented mining claims, reservations or exceptions in patents or in Acts authorizing the issuance thereof, water rights, claims or title to water.
b.  Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

## 4. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1970
## WITH A.L.T.A. ENDORSEMENT FORM 1 COVERAGE
## SCHEDULE OF EXCLUSIONS FROM COVERAGE

1.  Any law, ordinance or governmental regulation (including but not limited to building and zoning ordinances) restricting or regulating or prohibiting the occupancy, use or enjoyment of the land, or regulating the character, dimensions or location of any improvement now or hereafter erected on the land, or prohibiting a separation in ownership or a reduction in the dimensions or area of the land, or the effect of any violation of any such law ordinance or governmental regulation.
2.  Rights of eminent domain or governmental rights of police power unless notice of the exercise of such rights appears in the public records at Date of Policy.
3.  Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed or agreed to by the insured claimant, (b) not known to the Company and not shown by the public records but known to the insured claimant either at Date of Policy or at the date such claimant acquired an estate or interest insured by this policy or acquired the insured mortgage and not disclosed in writing by the insured claimant to the Company prior to the date such insured claimant became an insured hereunder, (c) resulting in no loss or damage to the insured claimant, (d) attaching or created subsequent to Date of Policy (except to the extent insurance is afforded herein as to any statutory lien for labor or material or to the extent insurance is afforded herein as to assessments for street improvements under construction or completed at Date of Policy).
4.  Unenforceability of the lien of the insured mortgage because of failure of the insured at Date of Policy or of any subsequent owner of the indebtedness to comply with applicable "doing business" laws of the state in which the land is situated.

## 5. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1970 WITH REGIONAL EXCEPTIONS

When the American Land Title Association Lenders Policy is used as a Standard Coverage Policy and not as an Extended Coverage Policy, the exclusions set forth in paragraph 4 above are used and the following exceptions to coverage appear in the policy.

### SCHEDULE B

This policy does not insure against loss or damage by reason of the matters shown in parts one and two following:
Part One:
1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
2.  Any facts, rights, interests, of claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.
3.  Easements, claims of easement or encumbrances which are not shown by the public records.
4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records.
5.  Unpatented mining claims, reservations or exceptions in patents or in Acts authorizing the issuance thereof, water rights, claims or title to water.
6.  Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records.

## 6. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1992
## WITH A.L.T.A. ENDORSEMENT FORM 1 COVERAGE
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of
1.  (a)  Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (I) the occupancy, use, or enjoyment of the land, (ii) the character, dimensions or location of any improvement now or hereafter erected on the land, (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part, or (iv) environmental protection. or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
    (b)  Any governmental police power not excluded by (a) above except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3.  Defects, liens, encumbrances, adverse claims or other matters.
    (a)  created. suffered, assumed or agreed to by the insured claimant,
    (b)  not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
    (c)  resulting in no loss or damage to the insured claimant;
    (d)  attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material or to the extent insurance is afforded herein as to assessments for street improvements under construction or completed at date of policy); or
    (e)  resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.
4.  Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable "doing business" laws of the state in which the land is situated.
5.  Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based  upon usury or any consumer credit protection or truth in lending law.
6.  Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.
7.  Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:
    (i)  the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
    (ii)  the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or
    (iii)  the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
        (a) to timely record the instrument of transfer; or
        (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

## 7. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1992 WITH REGIONAL EXCEPTIONS

When the American Land Title Association policy is used as a Standard Coverage Policy and not as an Extended Coverage Policy the exclusions set forth in paragraph 6 above are used
the following exceptions to coverage appear in the policy.

**SCHEDULE B**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of.
1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.
3. Easements, claims of easement or encumbrances which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records
5. Unpatented mining claims, reservations or exceptions in patents or in Acts authorizing the issuance thereof, water rights, claims or title to water.
6. Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records

## 8. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY - 1992
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of
1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land, (ii) the character, dimensions or location of any improvement now or hereafter erected on the land, (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part, or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant,
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy,
   (c) resulting in no loss or damage to the insured claimant,
   (d) attaching or created subsequent to Date of Policy, or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.
4. Any claim, which arises out of the transaction vesting in the Insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (i) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer, or
   (ii) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure
      (a) to timely record the instrument of transfer, or
      (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

## 9. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY - 1992 WITH REGIONAL EXCEPTIONS

When the American Land Title Association policy is used as a Standard Coverage Policy and not as an Extended Coverage Policy the exclusions set forth in paragraph 8 above ere used and the following exceptions to coverage appeer in the policy.

**SCHEDULE B**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of
Part One:
1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof
3. Easements, claims of easement or encumbrances which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records.
5. Unpatented mining claims, reservations or exceptions in patents or in Acts authorizing the issuance thereof: water rights, claims or title to water,
6. Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records.

## 10. AMERICAN LAND TITLE ASSOCIATION RESIDENTIAL TITLE INSURANCE POLICY - 1987
## EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees and expenses resulting from:
1. Governmental police power, and the existence or violation of any law or government regulation. This includes building and zoning ordinances and also laws and regulations concerning:
   · land use          · land division
   · improvements on the land    · environmental protection
   This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at Policy Date.
   This exclusion does not limit the zoning coverage described in Items 12 and 13 of Covered Title Risks.
2. The right to take the land by condemning it, unless:
   · a notice of exercising the right appears in the public records on the Policy Date
   · the taking happened prior to the Policy Date and is binding on you if you bought the land without knowing of the taking.
3. Title Risks:
   · that are created, allowed, or agreed to by you
   · that are known to you, but not to us, on the Policy Date - unless they appeared in the public records
   · that result in no loss to you
   · that first affect your title after the Policy Date - this does not limit the labor and material lien coverage in Item 8 of Covered Title Risks
   · failure to pay value for your title.
   · Lack of a right:
   · to any land outside the area specifically described and referred to in Item 3 of Schedule A, or
   · in streets, alleys, or waterways that touch your land
This exclusion does not limit the access coverage in Item 5 of Covered Title Risks.

Form No. 1491.EAGLE (10/98)

## ADDENDUM TO EXHIBIT B
## LIST OF PRINTED EXCEPTIONS AND EXCLUSIONS (By Policy Type)

### 11. EAGLE PROTECTION OWNER'S POLICY

### CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE - 1998
### ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE - 1998

#### EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes ordinances, laws and regulations concerning:
   a.   building
   b.   zoning
   c.   land use
   d.   improvements on the Land
   e.   land division
   f.   environmental protection

   This Exclusion does not apply to violations or the enforcement of these matters if notice of the violation or enforcement appears in the Public Records at the Policy Date.
   This Exclusion does not limit the coverage described in Covered Risk 14, 15, 16, 17 or 24.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at the Policy Date.

3. The right to take the Land by condemning it, unless:
   a.   a notice of exercising the right appears in the Public Records at the Policy Date; or
   b.   the taking happened before the Policy Date and is binding on You if You bought the Land without Knowing of the taking.

4. Risks:
   a.   that are created, allowed, or agreed to by You, whether or not they appear in the Public Records;
   b.   that are Known to You at the Policy Date, but not to Us, unless they appear in the Public Records at the Policy Date;
   ^    that result in no loss to You; or
        that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.d, 22, 23, 24 or 25.

5. Failure to pay value for Your Title.

6. Lack of a right:
   a.   to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b.   in streets, alleys, or waterways that touch the Land
   This Exclusion does not limit the coverage described in Covered Risk 11 or 18.

### 12. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1992 WITH A.L.T.A. ENDORSEMENT FORM 1 COVERAGE WITH EAGLE PROTECTION ADDED

#### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
1. (a)   Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the Land; (iii) a separation in ownership or a change in the dimensions or area of the Land or any parcel of which the Land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under insuring provisions 14, 15, 16 and 24 of this policy.

   (b)   Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under insuring provisions 14, 15, 16 and 24 of this policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the Public Records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without Knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

   (a) created, suffered, assumed or agreed to by the Insured Claimant;

   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

   (c) resulting in no loss or damage to the Insured Claimant;

   (d) attaching or created subsequent to Date of Policy (this paragraph (d) does not limit the coverage provided under insuring provisions 7, 8, 16, 17, 19, 20, 21, 23, 24 and 25); or



resulting in loss or damage which would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

i.   Unenforceability of the lien of the Insured Mortgage because of the inability or failure of the Insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the Land is situated.

i.   Invalidity or unenforceability of the lien of the Insured Mortgage, or claim thereof, which arises out of the transaction evidenced by the Insured Mortgage and is based upon:

(a) usury, except as provided under insuring provision 10 of this policy; or

(b) any consumer credit protection or truth in lending law.

j.   Taxes or assessments of any taxing or assessment authority which become a lien on the Land subsequent to Date of Policy.

7.   Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:

(a)   the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or

(b)   the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or

(c)   the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
(i) to timely record the instrument of transfer; or
(ii) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

8.   Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This exclusion does not limit the coverage provided under insuring provision 7.

9.   Lack of priority of the lien of the Insured Mortgage as to each and every advance made after Date of Policy, and all interest charged thereon, over liens, encumbrances and other matters affecting title, the existence of which are Known to the Insured at:

(a)   The time of the advance; or

(b)   The time a modification is made to the terms of the Insured Mortgage which changes the rate of interest charged, if the rate of interest is greater as a result of the modification than it would have been before the modification.

This exclusion does not limit the coverage provided under insuring provision 7.

### SCHEDULE B

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.   Environmental protection liens provided for by the following existing statutes, which liens will have priority over the lien of the Insured Mortgage when they arise: NONE.

## 13. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1992
## WITH EAGLE PROTECTION ADDED
## WITH REGIONAL EXCEPTIONS

When the American Land Title Association loan policy with EAGLE Protection Added is used as a Standard Coverage Policy and not as an Extended Coverage Policy the exclusions set forth in paragraph 12 above are used and the following exceptions to coverage appear in the policy:

### SCHEDULE B

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

Part One:

1.   Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.

2.   Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.

3.   Easements, claims of easement or encumbrances which are not shown by the public records.

4.   Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records.

5.   Unpatented mining claims; reservations or exceptions in patents or in acts authorizing the issuance thereof; water rights, claims or title to water.

6.   Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records.

Part Two:

1.   Environmental protection liens provided for by the following existing statutes, which liens will have priority over the lien of the Insured Mortgage when they arise: NONE

# Alliance Title

**Branch:**
5060 California Ave. 7th Floor
Bakersfield, CA  93309
(661) 321-3388
FAX: (661) 321-3395

## PRELIMINARY REPORT

Title Officer: Donald Mushaney /dm3

**ORDER NO. 15192778-136**

**Ref. No:   15192778**

**Acacia Corporate Management LLC**
**108 East John Street**
**Carson City, NV 89706**
**Attn.:  Michael**

**Property Address:**

**, CA**
APN:  **003-241-05-00-3 & 386-140-08-00-8 &**

**387-180-06-00-1**

In response to the above referenced application for a policy of title insurance, this Company reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms. The printed Exceptions and Exclusions from the coverage of said Policy or Policies are set forth in Exhibit B attached.

**Please read the exceptions shown or referred to below and the Exceptions and Exclusions set forth in Exhibit B of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters, which are not covered under the terms of the title insurance policy and should he carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.** This report (and any supplements hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

In the event of cancellation or if the transaction has not closed within 90 days from the date hereof, the rate imposed and collectable shall be a minimum of $360.00, pursuant to Section 12404 of the Insurance code, unless other provisions are made.

The form of policy of title insurance contemplated by this report is:

## CLTA Standard Policy issued by First American Title Insurance Company

Dated as of **June 8, 2006** at 7:30 a.m.

The estate or interest in the land hereinafter described or referred to covered by this Report is:

**A Fee**

Title to said estate or interest at the date hereof is vested in:

## Acacia Corporate Management, LLC, a Nevada Limited Liability Company

The land referred to in this Report is situated in the State of California, County of **Kern** and is described as follows:
(See "Legal Description" Exhibit A attached)

At the date hereof exceptions to coverage in addition to the printed exceptions and Exclusions contained in said policy would be as follows:

# THE FOLLOWING ITEMS AFFECTS PARCEL 1:

1.    General and special taxes and assessments for the fiscal year 2006-2007, a lien not yet due or payable.

2.    General and special taxes and assessments for the fiscal year 2005-2006.

| | |
|---|---|
| First Installment: | $1,682.69 Paid |
| Second Installment: | $1,682.68 Paid |
| Tax Rate Area: | 001-001 |
| A. P. No.: | 003-241-05-00-3 |

3.    The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

4.    Water rights, claims or title to water, whether or not shown by the public records.

5.    A deed of trust to secure an original indebtedness of $240,000.00 recorded October 2, 1996 , as instrument no. 0196128342 of Official Records.

| | |
|---|---|
| Dated: | July 11, 1996 |
| Trustor: | Steven Booth, Trustee of the Aligned Enterprises Trust dated June 15, 1995 |
| Trustee: | American Title Insurance Company, a corporation |
| Beneficiary: | Reinhilde H. Schwartz, an unmarried woman |

According to the public records, by mesne assignment, the beneficial interest under the deed of trust has been assigned to Robert Bell recorded April 12, 2004 , as instrument no. 0204080420 of Official Records

6.    A deed of trust to secure an original indebtedness of $500,000.00 recorded March 7, 2000 , as instrument no. 0200026616 of Official Records.

| | |
|---|---|
| Dated: | March 6, 2000 |
| Trustor: | Alpha Omega Trust, a Trust Agreement, dated The 16th Day of June 1995, whose Trustees are V. Steven and Louise Booth |
| Trustee: | World Title Co. |
| Beneficiary: | Southern Financial |

7.  A deed of trust to secure an original indebtedness of $500,000.00 recorded July 19, 2000, as instrument no. 0200087327 of Official Records.

| | |
|---|---|
| Dated: | March 6, 2000 |
| Trustor: | Alpha Omega Trust, a Trust Agreement, dated The 16th Day of June 1995, whose Trustees are V. Steven and Louise Booth |
| Trustee: | World Title Co. |
| Beneficiary: | Southern Financial |

.   Document(s) declaring modifications thereof recorded December 3, 003 , as instrument no. 0203262906 of Official Records.

According to the public records, the beneficial interest under the deed of trust was assigned to Treble by assignment recorded December 30, 2004 , as instrument no. 0204324067 of Official Records.

8.  A federal tax lien in favor of the United States of America, recorded December 22, 2005 , as instrument no. 0205352650 of Official Records.

| | |
|---|---|
| Serial No.: | 265497405 |
| Debtor: | Acacia Corporate Management, LLC, a Nevada LLC, as nominee of Bakersfield Properties & Trust Co., as nominee of Aligned Enterprise Trust, as nominee of V. Steven & Louise Q. Booth, as to the parcel of real property described as follows: Parcel 1 of said report |
| Amount: | $2,009,088.65, and any other amounts due thereunder. |

## THE FOLLOWING ITEMS AFFECTS PARCEL 2 & 2A:

9.  General and special taxes and assessments for the fiscal year 2006-2007, a lien not yet due or payable.

10. General and special taxes and assessments for the fiscal year 2005-006.

| | |
|---|---|
| First Installment: | $3,177.94 Paid |
| Second Installment: | $3,177.94 Paid |
| Tax Rate Area: | 001-071 |
| A. P. No.: | 386-140-08-00-8 |
| Affects: | Lot 29 of Tract No. 3817 |

Page No. 4
File No. **15192778-136**

11.  Supplemental taxes for the fiscal year 2005 assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

| First Installment: | $150.93 Paid |
|---|---|
| Second Installment: | $150.93 delinquent |
| Penalty: | $25.09 |
| Tax Rate Area: | 001-071 |
| A. P. No.: | 386-140-08-00-8 |
| Affects: | Lot 29 Tract No. 3817  (#05-4004312) |

12.  Supplemental taxes for the fiscal year 2005 assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

| First Installment: | $489.12 Paid |
|---|---|
| Second Installment: | $489.11 delinquent |
| Penalty: | $58.91 |
| Tax Rate Area: | 386-140-08-00-8 |
| Affects: | Lot 29 Tract No. 3817  (#05-4004313) |

13.  Taxes and assessments levied by the Olcese Water District

14.  The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

15.  Water rights, claims or title to water, whether or not shown by the public records.

16.  An easement for ditches and canals and incidental purposes, recorded June 17, 1892 in Book 3 Page(s) 137 of Deeds.

   In Favor of:   Geo C. Doherty

.   The location of the easement cannot be determined from record information.

17.  An easement for pipelines and incidental purposes, recorded August 8, 1975 in Book 4908 Page(s) 1456 of Official Records.

   In Favor of:   Olcese Water District, a California Water District
   Affects:       reference is made to said document for full particulars

18.  An easement shown or dedicated on the Map as referred to in the legal description

   For:      public utilities, slope, landscape and incidental purposes.
   Affects:  as shown on the recorded map

Page No. 5
File No. **15192778-136**

19.    Covenants, conditions, restrictions and easements in the document recorded December 6, 1976 in Book 4994 Page(s) 84 of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, national origin, sexual orientation, marital status, ancestry, source of income or disability, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes or Section 12955 of the California Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status

An easement as contained in the above document.

For:          entry and access and incidental purposes.

The location of the easement cannot be determined from record information.

20.    An easement for facilities and incidental purposes, recorded October 16, 2003 , as instrument no. 0203225641 of Official Records.

In Favor of:   Olcese Water District a public agency it's successor's and/or assigns
Affects:       reference is made to said document for full particulars

21.    A deed of trust to secure an original indebtedness of $900,000.00 recorded April 28, 2004 , as instrument no. 020495746 of Official Records.

Dated:         April 17, 2004
Trustor:       Bakersfield Properties and Trust Company
Trustee:       CJ Investment Services, Inc., a California Corporation
Beneficiary:   Southern Financial

According to the public records, the beneficial interest under the deed of trust was assigned to Treble, LLC, a California Limited Liability Company by assignment recorded June 11, 2004 , as instrument no. 0204135106 of Official Records.

Page No. 6
File No. **15192778-136**

22.    A federal tax lien in favor of the United States of America, recorded December 22, 2005 , as instrument no. 0205352649 of Official Records.

Serial No.:    2654969905
Debtor:        Acacia Corporate Management, LLC, a Nevada LLC, as nominee of Bakersfield Properties & Trust Co., as nominee of Aligned Enterprise Trust, as nominee of V. Steven & Louise Q. Booth, as to the parcel of real property described as follows: Parcel 1 of said report
Amount:        $2,009,088.65, and any other amounts due thereunder.

## THE FOLLOWING ITEMS AFFECTS PARCEL 3 & 3A & 3B:

23.    General and special taxes and assessments for the fiscal year 2006-2007, a lien not yet due or payable.

24.    General and special taxes and assessments for the fiscal year 2005-2006.

First Installment:     $1,464.76  Paid
Second Installment:    $1,464.75  delinquent
Penalty:               $156.47
Tax Rate Area:         001-071
A. P. No.:             387-180-06-00-1

25.    The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

26.    Water rights, claims or title to water, whether or not shown by the public records.

27.    An easement shown or dedicated on the Map as referred to in the legal description

For:        public utilities, storm drain and incidental purposes.
Affects:    as shown on the recorded map

28. Covenants, conditions, restrictions, easements, assessments, liens, charges, terms and provisions in the document recorded October 11, 1984 in Book 5701 Page(s) 627 of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, national origin, sexual orientation, marital status, ancestry, source of income or disability, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes or Section 12955 of the California Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

. Document(s) declaring modifications thereof recorded December 28, 1984 in Book 5721 Page(s) 169 of Official Records and October 17, 1997 , as instrument no. 0197138958 of Official Records

29. The terms and provisions contained in the document entitled "Club Membership Purchase Agreement and subject to the terms and conditions therein
Recorded:           November 1, 1984 in Book 5707 Page(s) 824 of Official Records

. Document(s) declaring modifications thereof recorded March 1, 1988 in Book 6098 Page(s) 1673 of Official Records

   Reference is made to said Document for full particulars.   .

30. The terms and provisions contained in the document entitled "Right of Entry Agreement, recorded January 27, 1989 in Book 6204 Page(s) 115 of Official Records

31. A deed of trust to secure an original indebtedness of $900,000.00 recorded April 28, 2004 , as instrument no. 020495746 of Official Records.

   | | |
   |---|---|
   | Dated: | April 7, 004 |
   | Trustor: | Bakersfield Properties and Trust Company |
   | Trustee: | CJ Investment Services, Inc., a California Corporation |
   | Beneficiary: | Southern Financial |
   | Affects: | said land and other properties |

   According to the public records, the beneficial interest under the deed of trust was assigned to Treble, LLC, a California Limited Liability Company by assignment recorded June 11, 2004 , as instrument no. 0204135106 of Official Records.

32.    A federal tax lien in favor of the United States of America, recorded December 22, 2005 , as
instrument no. 0205352651 of Official Records.

Serial No.:    265496305
Debtor:        Acacia Corporate Management, LLC, a Nevada LLC, as nominee of Bakersfield
Properties & Trust Co., as nominee of Aligned Enterprise Trust, as nominee of
V. Steven & Louise Q. Booth, as to the parcel of real property described as
follows: Parcel 1 of said report
Amount:        $2,009,088.65, and any other amounts due thereunder.

## REQUIREMENTS:

A.    With respect to **Acacia Corporate Management, LLC, a Nevada Limited Liability
Company**:

a.    A copy of its operating agreement and any amendments thereto;
b.    If it is a California limited liability company, that a certified copy of its articles of
organization (LLC-1) and any certificate of correction (LLC-11), certificate of
amendment (LLC-2), or restatement of articles of organization (LLC-10) be recorded in
the public records;
c.    If it is a foreign limited liability company, that a certified copy of its application for
registration (LLC-5) be recorded in the public records;
d.    With respect to any deed, deed of trust, lease, subordination agreement or other
document or instrument executed by such limited liability company and presented for
recordation by the Company or upon which the Company is asked to rely, that such
document or instrument be executed in accordance with one of the following, as
appropriate:
(i)    If the limited liability company properly operates through officers appointed or
elected pursuant to the terms of a written operating agreement, such document
must be executed by at least two duly elected or appointed officers, as follows:
the chairman of the board, the president or any vice president, and any
secretary, assistant secretary, the chief financial officer or any assistant
treasurer;
(ii)   If the limited liability company properly operates through a manager or
managers identified in the articles of organization and/or duly elected pursuant
to the terms of a written operating agreement, such document must be executed
by at least two such managers or by one manager if the limited liability
company properly operates with the existence of only one manager.
e.    Other requirements which the Company may impose following its review of the
material required herein and other information which the Company may require.

## NOTES:

a.   This report does not reflect requests for notice of default, requests for notice of delinquency, subsequent transfers of easements, and similar matters not germane to the issuance of the policy of title insurance anticipated hereunder.

b.   If this company is requested to disburse funds in connection with this transaction, Chapter 598 of 1989 Mandates of the California Insurance Code requires hold periods for checks deposited to escrow or sub-escrow accounts. Such periods vary depending upon the type of check and anticipated methods of deposit should be discussed with the escrow officer.

c.   No endorsement issued in connection with the policy and relating to covenants, conditions or restrictions provides coverage for environmental protection.

d.   Special recordings: Due to a severe budget shortfall, many county recorders have announced that severe limitations will be placed on the acceptance of "special recordings."

e.   Homeowners association: if the property herein described is subject to membership in a homeowners association, it will become necessary that we be furnished a written statement from the said homeowners association of which said property is a member, which provides that all liens, charges and/or assessments levied on said land have been paid. Said statement should provide clearance up to and including the time of closing. In order to avoid unnecessary delays at the time of closing, we ask that you obtain and forward said statement at your earliest convenience.

f.   Demands: This company requires that all beneficiary demands be current at the time of closing. If the demand has expired and a current demand cannot be obtained it may be necessary to hold money whether payoff is made based on verbal figures or an expired demand.

g.   Line of credit payoffs: If any deed of trust herein secures a line of credit, we will require that the account be frozen and closed and no additional advances be made to the borrower.  If the beneficiary is unwilling to freeze the account, we will require you submit to us all unused checks, debit vouchers, and/or credit cards associated with the loan along with a letter (affidavit) signed by the trustor stating that no additional advances will be made under the credit line.  If neither of the above is possible, it will be necessary to hold any difference between the demand balance and the maximum available credit.

h.   Maps: The map attached hereto may or may not be a survey of the land depicted thereon. You should not rely upon it for any purpose other than orientation to the general location of the parcel or parcels depicted. Alliance Title Company expressly disclaims any liability for alleged loss or damages which may result from reliance upon this map.

SEE RECORD OWNER GUARANTEE

## Exhibit A
## LEGAL DESCRIPTION

All that certain real property in the County of KERN, State of California, described as follows:

Parcel 1: (APN.: 003-241-05)

Lots 11 and 12 in Block 201 of City of Bakersfield, County of Kern, State of California, as per map recorded November 25, 1898 in Book 1 Page(s) 13 and 14 of Maps, in the Office of the County Recorder of said County.

Parcel 2: (APN.: 386-140-08)

Lot 29 of Tract No. 3817, in the City of Bakersfield, County of Kern, State of California, as per map recorded October 25, 1976 in Book 26 Page(s) 151, 152 and 153 of Maps, in the Office of the County Recorder of said County.

Parcel 2A;

A non-exclusive easement to use Lots 52 and 68 as depicted on the map for ingress, egress, open space and drainage purposes.

Except therefrom all oil, gas, minerals and other hydrocarbon substances lying below the surface of said land, but with no right of surface entry, as provided in deeds of record.

Parcel 3: (APN.: 387-180-06)

Lot 4 of Tract No. 4578, Unit B, in the City of Bakersfield, County of Kern, State of California, as per map recorded April 11, 1984 in Book 33 Page(s) 66 and 67 of Maps, in the Office of the County Recorder of said County.

Except therefrom all oil, gas, minerals and other hydrocarbon substances lying below the surface of said land, but with no right of surface entry, as provided in deeds of record.

Parcel 3A:

A non-exclusive easement for ingress, egress and road purpose on, over and across the following described property:

All that portion of Section 14, Township 29 South, Range 29 East, Mount Diablo Base and Meridian , in the City of Bakersfield, County of Kern, State of California, according to the Official Plat thereof , being more particularly described as follows:

Commencing at the Northwest corner of said Section 14; Thence South 00°03'20" West on and along the West line of said Section 14, a distance of 2490.34 feet; Thence South 79°20'56" East, 24.18 feet; Thence North 42°12'28" East, 18.18 feet; Thence North 08°27'33" East, 4.50 feet to the true point of beginning ; Thence (1) South 81°32'27" East, 35.81 feet; Thence (2) South 36°32'27" East, 5.66 feet; Thence (3) South 81°32'27" East, 26.00 feet; Thence (4) South 36°32'27" East; Thence (5) South 81°32'27" East, 45.00 feet; Thence (6) North 53°27'33" East, 16.97 feet; Thence (7) South 81°32'27" East, 108.01 feet to the beginning of a tangent Curve concave to the South having a radius of 100.00 feet; Thence (8) Easterly on and along said curve through a central angle of 13°25'55", an arc distance of 23.44 feet to the beginning of a tangent reverse curve concave to the North having a radius of 766.00 feet; Thence (9) Easterly on and along said curve through a central angle of 36°24'58", an arc distance of 486.86 feet; Thence (10) North 75°28'58" East, 4603 feet to the beginning of a tangent curve concave to the South having a radius of 384.00 feet; Thence (11) Easterly on and along said curve through a central angle of 28°41'30", an arc distance of 192.29 feet; Thence (12) South 75°50'00" East, 46.04 feet to the beginning of a tangent curve concave to the Southwest having a radius of 334.00 feet; Thence (13) Southeasterly on and along said curve through a central angle of 77°22'30", an arc distance of 451.05 feet; Thence (14) South 01°32'30" West, 175.00 feet to the beginning of a tangent curve concave to the Northeast having a radius of 916.00 feet; Thence (15) Southeasterly on and along said curve through a central angle of 29°13'30", an arc distance of 467.23 feet; Thence (16) South 27°41'00" East, 107.84 feet to the beginning of a tangent curve concave to the Northeast having a radius of 416.00 feet ; Thence (17) Southwesterly on and along said curve through a central angle of 54°26'35", an arc distance of 395.29 feet; Thence (18) South 82°07'35" East, 326.44 feet to the beginning of a tangent curve concave to the North having a radius of 291.00 feet; Thence (19) Southeasterly on and along said curve through a central angle of 43°20'39", an arc distance of 220.14 feet; Thence (20) North 54°31'46", 46.86 feet to the beginning of a tangent curve concave to the Southeast having a radius of 257.00 feet; Thence (21) Northeasterly on and along said curve through a central angle of 08°58'27", an arc distance of 40.25 feet to the beginning of a tangent reverse curve concave to the Northwest having a radius of 600.00 feet; Thence (22) Northeasterly on and along said curve through a central angle of 01°03'14", an arc distance of 11.04 feet to the beginning of a tangent reverse curve concave to the Southeast having a radius of 200.00 feet; Thence (23) Easterly on and along said curve through a central angle of 15°29'49", an arc distance of 54.09 feet to the beginning of a compound curve concave to the South having a radius of 259.00 feet; Thence (24) Easterly on and along said curve through a central angle of 41°50'06", an arc distance of 189.11 feet to the beginning of a compound curve concave to the Southwest having a radius of 200.00 feet; Thence )25) Southeasterly on and along said curve through a central angle of 15°29'49", an arc distance of 54.09 feet to the beginning of a reverse curve concave to the Northeast having a radius of 600.00 feet; Thence (26) Southeasterly on and along said curve through a central angle 01°03'14", an arc distance of 11.04 feet to the beginning of reverse curve concave to the Southwest having a radius of 257.00 feet; Thence (27) Southeasterly on and along said curve through a central angle of 05°25'01", an arc distance of 24.30 feet; Thence (28) South 40°21'30" East, 5.85 feet to the beginning of a tangent curve concave to the West having a radius of 20.00 feet; Thence (29) Southerly on and along said curve through a central angle 84°41'42", an arc distance of 29.59 feet to a point of cusp with a curve concave to the Southeast having a radius of 391.00 feet and to which point a radial line bears North 45°39'48" West; Thence (30) Northeasterly on and along said curve through a central angle of 05°18'18", an arc distance of 36.20 feet; Thence (31) North 49°38'30" East, 38.00 feet to a point of cusp with a curve concave to the North having a radius of 20.00 feet and to which point a radial line radial line bears North 40°21'30" West; Thence (32) Northeasterly on and along said curve through a central angle of

90°00'00", an arc distance of 31.42 feet; Thence (33) North 40121'30" West, 4.09 feet to the beginning of a tangent curve concave to the Southwest having a radius of 293.00 feet; Thence (34) Northwesterly on and along said curve through a central angle of 05°25'01", an arc distance of 27.70 feet to the beginning of a compound curve to the Southwest having a radius of 200.00 feet; Thence (35) Northwesterly on and along said curve through a central angle of 12°34'21", an arc distance of 43.89 feet to the beginning of a tangent reverse curve concave to the Northeast having a radius of 600.00 feet whose radial bears North 31°39'08" East; Thence (36) Northeasterly on and along said curve through a central angle of 01°18'07", an arc distance of 13.63 feet to the beginning of a tangent reverse concave to the Southwest having a radius of 291.00 feet; Thence (37) Northwesterly on and along said curve through a central angle of 05°25'56", an arc distance of 27.59 feet; Thence (38) North 27°31'19" East, 0.50 feet to the beginning of a non-tagent curve concave to the Southwest having a radius of 291.50 feet whose radial bears South 27°31'19" West; Thence (39) Northwesterly on and along said curve through a central angle of 28°50'11", an arc distance of 146.71 feet; Thence (40) South 85°19'12" West, 15.07 feet to the beginning of a non0tangent curve concave to the Southwest having a radius of 291.00 feet whose radial bears South 04°16'41" East; Thence (41) Westerly on and along said curve through a central angle of 10°56'52", an arc distance of 55.00 feet to the beginning of a tangent reverse curve concave to the Northwest having a radius of 600.00 feet; Thence (42) Southwesterly on and along said curve through a central angle of 01°18'07" , an arc distance of 13.63 feet to the beginning of a tangent reverse curve concave to the Southeast having a radius of 200.00 feet; Thence (43) Southwesterly on and along said curve through a central angle of 12°34'21", an arc distance of 43.89 feet to the beginning of a compound curve concave to the Southeast having a radius of 293.00 feet; Thence (44) Southwesterly on and along said curve through a central angle of 15°30'47", an arc distance of 79.33 feet to the beginning of a tangent reverse curve concave to the Northeast havinga radius of 201.54 feet; Thence (45) Southwesterly on and along said curve through a central angle of 16°00'34", an arc distance of 56.31 feet to the beginning of a compound curve concave ti the Northwest having a radius of 259.00 feet whose radial bears South 26°00'00" East; Thence (46) Westerly on and along said curve through a central angle of 33°52'25", an arc distance of 153.12 feet; Thence (47) North 82°07'35" West, 326.44 feet to the beginning of a tangent curve concave to the Northeast having a radius of 384.00 feet; Thence (48) Northwesterly on and along said curve through a central angle of  54°26'35", an arc distance of 364.88 feet; Thence (48) North 27°41'00" West, 107.84 feet to the beginning of a tangent curve concave to the Northeast having a radius of 884.00 feet; Thence (50) Northwesterly on and along said curve through a central angle of 29°13'30", an arc distance of 450.00 feet; Thence (51) North 01°32'30" East, 175.00 to the beginning of a tangent curve concave to the Southwest having a radius of 366.00 feet; Thence (52) Northwesterly on and along said curve through a central angle 77°22'30", an arc distance of 494.26 feet; Thence (53) North 75°50'00" West, 46.04 feet to the beginning of a tangent curve concave to the South having a radius of 416.00 feet; Thence (54) Westerly on and along said curve through a central angle of 28°41'30", an arc distance of 208.32 feet; Thence (55) South 75°28'30" West,  46.04 feet to the beginning of a tangent curve concave to the North havinga radius of 734.00 feet; Thence (56) Westerly on and along said curve through a central angle of 37°57'55", an arc distance of 486.36 feet; Thence (57) North 66°33'35" West, 74.82 feet to the beginning of a tangent curve to the Southwest having a radius of 100.00 feet; Thence (58) Westerly on and along said curve through a central angle of 14°58'52", an arc distance of 26.15 feet; Thence (59) North 81°32'27" West, 21.31 feet; Thence (60) North 36°32'27" West, 16.97 feet; Thence (61) North 81°32'27" West, 45.00 feet; Thence (62) South 53°27'33" West, 11.31 feet; Thence (63) North 81°32'27" West, 26.00 feet; Thence (64) South

53°27'33" West, 5.66 feet; Thence (65) North 81°32'27" West, 35.81 feet; Thence (66) South 08°27'33" West, 56.00 feet to the true point of beginning

Parcel No. 3B:

A non-exclusive easement appurtenant to Parcel 3 for access, side yard, encroachment, repairs, replacement, maintenance, overhang, drainage, landscaping, recreation and similar purposes, as defined in Section 2 of the "Declaration of Covenants, Conditions and Restrictions Establishing A Planned Residential Development for Rio Bravo Fairway, Tract 4578", recorded October 11, 1984 in Book 5701 Page(s) 627 of Official Records

APN No:  003-241-05-00-3  386-140-08-00-8  387-180-06-00-1





386-14

TRACT 3817

SCHOOL DIST. 1-71

386-14

ASSESSORS MAP NO. 386-14
COUNTY OF KERN

Note: This map is for assessment purposes
only. It is not to be construed as portraying
legal ownership or divisions of land for
purposes of zoning or subdivision law.

387-18

PTN. W1/2 OF SEC. 14 T. 29S. R. 29E.
TRACT 4578 UN. A

SCHOOL DIST. /-71

387-18

Filed: April 11, 1984



ASSESSORS MAP NO. 387-18
COUNTY OF KERN

Note : This map is for assessment purposes only. It is not to be construed as portraying legal ownership or divisions of land for purposes of zoning or subdivision law.

# Alliance Title

## Please call your Escrow Officer if your answer is "Yes" to any of the following questions

- At any time during the preceding 6 months, has there been, or is there currently, any work or construction of improvements on the property?
- Are any of the parties currently vested in title, on the property herein currently Incapacitated or Deceased?
- Are any of the principals of the transaction intending to use a Power of Attorney to execute any of the documentation involved in this transaction?
- Has there been a recent change of marital status of any of the principals involved in this transaction?
- Is the property herein intended to be transferred into a Trust, Partnership, Corporation, or Limited Liability Company?
- Do the sellers of the property reside outside the state of California?
- Will the property described herein be part of a Tax Deferred Exchange?

## In order to better serve you, We ask that you remember:

- All parties signing documents must have a valid Photo Identification Card, Drivers License, or Passport for notarial acknowledgment.
- Please call your Escrow Officer with any Loan or Lien payoff information, if required, he or she may order payoff demands in a timely manner, & advise your Escrow Officer of any loan(s) that are to be assumed by the buyer.
- If parties are obtaining a loan, your Escrow Officer will need to have the Fire/Hazard Insurance, agent name & phone number to add the new lender on the policy as a loss payee.
- If there is to be a change of ownership, it will be necessary for the parties acquiring title to indicate how they would like to be vested. **Alliance Title** Company has a worksheet available that will briefly explain each of the various methods of holding title (please feel free to request a copy from us). Note: Each method by which you can hold title has different legal &/or tax considerations & parties are encouraged to obtain advise from an Attorney, CPA, or other professional knowledgeable in this area.

## We Are Committed to Safeguarding Customer Information

In    er to better serve your needs now and in the future, you have provided or will provide us with certain information. We understand that you may be concerned about what we will do with such information – particularly any personal or financial information. We agree that you have a right to know how we will utilize personal information you provide to us.

## Applicability

This Privacy Policy governs our use of the information that you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity.

## Types of Information

Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:

- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;

- Information about your transactions with us, our affiliated companies, or others; and

- Information we receive from a consumer-reporting agency.

## Use of Information

The information you provide us is for our own legitimate business purposes and not for the benefit of any affiliated or nonaffiliated party. Therefore, we will not release your information to affiliated and nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such i    nation indefinitely, including the period after which any customer relationship has ceased. Such information may be used fo, any internal purpose, such as quality control efforts or customer analysis. Furthermore, we may also provide all the information we collect, as described above, to companies that perform marketing services on our behalf, on behalf of our affiliated companies, or to other financial institutions with whom we or our affiliated companies have joint marketing agreements.

## Former Customers

Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

## Confidentiality and Security

We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities that need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with the Privacy Policy. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

# Alliance Title

## Notice of Opportunity to Earn Interest

You have the opportunity to earn interest on the funds you deposit with us by instructing us to deposit your funds into an interest bearing account. (You do not have an opportunity to earn interest on any funds deposited by a lender.) If you elect to earn interest, there is an additional fee in the amount of $50.00 for establishing and maintaining such an account. It is important that you consider this cost as it may exceed the actual interest you earn.

**Example:** A regular savings deposit of $1,000.00 at an average interest rate of 3.0%* per annum for a 30 day period:

| Deposit | x | Rate | + | Annual | x | Days | = | Total Interest Earned |
|---------|---|------|---|--------|---|------|---|----------------------|
| $1,000.00 | x | .03 | + | 360 | x | 30 | = | $2.50 |

PLEASE READ THE FOLLOWING CAREFULLY:

**A.** If you do not want to have your funds deposited into an interest-bearing account, please initial below this paragraph and return this Notice and such will constitute an instruction to us that your funds be deposited into **Alliance Title Company** general escrow account. Likewise, non-receipt of this form will also constitute an instruction to us that your funds be deposited into **Alliance Title Company** general escrow account. For important information regarding the general escrow accounts, please read the disclosure in Paragraph C below.

Initials _____  _____

**B.** If you elect to have your funds earn interest in an interest-bearing account using **Alliance Title Company** depository bank, you **MUST** sign this form below, and return to **Alliance Title Company** both this signed form and a W-9 form, which can be provided upon request. Please be advised that you will be responsible for reporting all earnings to the applicable taxing authorities.

**C.** Should you not elect to earn interest on your deposit, your funds will be deposited into our general escrow account at a financial institution insured by the FDIC. The general escrow account is restricted and protected against claims by third parties or creditors of **Alliance Title Company**. This is a non-interest bearing account; however, **Alliance Title Company**, may receive certain financial benefits from that financial institution because of the general escrow account and its on-going banking relationship. These benefits may include, without limitation, credits allowed by such financial institution on loans to **Alliance Title Company** and earnings on investments made with the proceeds of such loans, accounting, reporting and other services and products of such financial institution. We do not have an obligation to account to you in any manner for the value of, or to compensate any party for, any benefit received by **Alliance Title Company**. Any such benefits shall be deemed additional compensation of **Alliance Title Company** for its services in connection with the escrow.

## ELECTION TO EARN INTEREST:

**I HEREBY AUTHORIZE AND DIRECT, Alliance Title Company TO OPEN AN INTEREST BEARING ACCOUNT AT Alliance Title Company DEPOSITORY BANK AND TO CHARGE THE ADDITIONAL FEE FOR THIS SERVICE.**

SIGNATURE: _____     DATE: _____

SIGNATURE: _____     DATE: _____

* Please note that this interest rate is only an example and **Alliance Title Company** does not guaranty the availability of any specific rate.

**W    E INSTRUCTIONS:** THIS COMPANY WILL BE ABLE TO WIRE FUNDS NECESSARY TO PAY LOANS IN FULL AND/OR PROCEEDS TO ESCROW PROVIDED WE HAVE LENDER PROCEEDS WIRED TO US WHEN THE LOAN FUNDS PRIOR TO RECORDING. THIS WILL ALLOW US THE COLLECTED FUNDS IN OUR ACCOUNT NECESSARY TO WIRE TO YOU. OUR WIRE INSTRUCTIONS ARE:

Bank:            **Centennial Bank**
Routing No.:  **107006981**
Address:       13700 E. Arapahoe Road
                    Englewood, CO 80112
Credit:         Alliance Title Company
Account No.: **2400619**
Escrow No.:  **15192778**

**PLEASE BE SURE TO REFERENCE OUR TITLE ORDER NUMBER AND TITLE OFFICER.**

IF YOU WISH TO HAVE PROCEEDS WIRED TO YOUR ESCROW ACCOUNT PLEASE REQUEST SO AT THE TIME YOU AUTHORIZE THE RECORDING AND VERIFY THAT WE HAVE YOUR CORRECT WIRE INSTRUCTIONS. FOR YOUR CONVENIENCE WE HAVE PROVIDED THE FOLLOWING FORM TO BE FILLED OUT AND FAXED PRIOR TO RECORDING:

-------------------------------------------------------------------------------------------------------------------------------------

*    IANCE TITLE COMPANY

DATE:_____  _____

YOUR ORDER NO. :_____  _____            OUR ESCROW NO.:_____  _____

ON THE ABOVE REFERENCE FILE PLEASE WIRE PROCEEDS TO OUR ACCOUNT. OUR WIRE INSTRUCTIONS ARE:

BANK:_____
BANK ADDRESS:_____
CITY:_____
CREDIT: TO: _____
ACCOUNT NO.: _____
ABA ROUTING NUMBER:_____
SPECIAL INSTRUCTIONS: _____
_____
_____
_____

Note: If you have any documents pertaining to this file please call your title unit or our dispatch department for pickup. Our telephone number is: (661) 321-3388

## EXHIBIT B
## LIST OF PRINTED EXCEPTIONS AND EXCLUSIONS (By Policy Type)

### 1. CALIFORNIA LAND TITLE ASSOCIATION STANDARD COVERAGE POLICY - 1990
### SCHEDULE B

#### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees of expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notice of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5 (a) Unpatented mining claims, (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof, (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the public records.

#### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land, (ii) the character, dimensions or location of any improvement now or hereafter erected on the land, (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part, or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge
3. Defects, liens, encumbrances, adverse claims, or other matters.
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant,
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy,
   (c) resulting in no loss or damage to the insured claimant,
   (d) attaching or created subsequent to Date of Policy, or
       resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable "doing business" laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by their policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### 2. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY FORM B - 1970
### SCHEDULE OF EXCLUSIONS FROM COVERAGE

1. Any law, ordinance or governmental regulation (including but not limited to building and zoning ordinances) restricting or regulating or prohibiting the occupancy, use or enjoyment of the land, or regulating the character, dimensions or location of any improvement now or hereafter erected on the land, or prohibiting a separation in ownership or a reduction in the dimensions of area of the land, or the effect of any violation of any such law, ordinance or governmental regulation.
2. Rights of eminent domain or governmental rights of police power unless notice of the exercise of such rights appears in the public records at Date of Policy.
3. Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed or agreed to by the insured claimant: (b) not known to the Company and not shown by the public records but known to the insured claimant either at Date of Policy or at the date such claimant acquired an estate or interest insured by this policy and not disclosed in writing by the insured claimant to the Company prior to the date such insured claimant became an insured hereunder. (c) resulting in no loss or damage to the insured claimant, (d) attaching or created subsequent to Date of Policy, or (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.

### 3. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY FORM B - 1970
### WITH REGIONAL EXCEPTIONS

When the American Land Title Association policy is used as e Standard Coverage Policy and not as an Extended Coverage Policy the exclusions set forth in paragraph 2 above are used and the following exceptions to coverage appear in the policy.

#### SCHEDULE B

This policy does not insure against loss or damage by reason of the matters shown in parts one and two following:
Part One:
1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.
3. Easements, claims of easement or encumbrances which are not shown by the public records.
   Discrepancies, conflicts in boundary lines shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records Unpatented mining claims, reservations or exceptions in patents or in Acts authorizing the issuance thereof, water rights, claims or title to water.
b. Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

### 4. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1970
### WITH A.L.T.A. ENDORSEMENT FORM 1 COVERAGE
### SCHEDULE OF EXCLUSIONS FROM COVERAGE

1. Any law, ordinance or governmental regulation (including but not limited to building and zoning ordinances) restricting or regulating or prohibiting the occupancy, use or enjoyment of the land, or regulating the character, dimensions or location of any improvement now or hereafter erected on the land, or prohibiting a separation in ownership or a reduction in the dimensions or area of the land, or the effect of any violation of any such law ordinance or governmental regulation.
2. Rights of eminent domain or governmental rights of police power unless notice of the exercise of such rights appears in the public records at Date of Policy.
3. Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed or agreed to by the insured claimant, (b) not known to the Company and not shown by the public records but known to the insured claimant either at Date of Policy or at the date such claimant acquired an estate or interest insured by this policy or acquired the insured mortgage and not disclosed in writing by the insured claimant to the Company prior to the date such insured claimant became an insured hereunder, (c) resulting in no loss or damage to the insured claimant, (d) attaching or created subsequent to Date of Policy (except to the extent insurance is afforded herein as to any statutory lien for labor or material or to the extent insurance is afforded herein as to assessments for street improvements under construction or completed at Date of Policy).
4. Unenforceability of the lien of the insured mortgage because of failure of the insured at Date of Policy or of any subsequent owner of the indebtedness to comply with applicable "doing business" laws of the state in which the land is situated.

### 5. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1970 WITH REGIONAL EXCEPTIONS

When the American Land Title Association Lenders Policy is used as a Standard Coverage Policy and not as an Extended Coverage Policy, the exclusions set forth in paragraph 4 above are used and the following exceptions to coverage appear in the policy.

#### SCHEDULE B

This policy does not insure against loss or damage by reason of the matters shown in parts one and two following:
Part One:
1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
2. Any facts, rights, interests, of claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.
3. Easements, claims of easement or encumbrances which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records.
5. Unpatented mining claims, reservations or exceptions in patents or in Acts authorizing the issuance thereof, water rights, claims or title to water.
6. Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records.

### 6. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1992
### WITH A.L.T.A. ENDORSEMENT FORM 1 COVERAGE
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of
1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land, (ii) the character, dimensions or location of any improvement now or hereafter erected on the land, (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part, or (iv) environmental protection. or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters.
   (a) created. suffered, assumed or agreed to by the insured claimant,
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material or the extent insurance is afforded herein as to assessments for street improvements under construction or completed at date of policy); or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable "doing business" laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.
7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:
   (i) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
   (ii) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or
   (iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
       (a) to timely record the instrument of transfer; or
       (b) of such recordation to impart notice to e purchaser for value or a judgment or lien creditor.

### 7. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1992 WITH REGIONAL EXCEPTIONS

When the American Land Title Association policy is used as e Standard Coverage Policy and not as an Extended Coverage Policy the exclusions set forth in paragraph 6 above are used the following exceptions to coverage appear in the policy.

## SCHEDULE B

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of.
1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.
3. Easements, claims of easement or encumbrances which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records
5. Unpatented mining claims, reservations or exceptions in patents or in Acts authorizing the issuance thereof, water rights, claims or title to water.
6. Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records

## 8. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY - 1992
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of
1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land, (ii) the character, dimensions or location of any improvement now or hereafter erected on the land, (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part, or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant,
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy,
   (c) resulting in no loss or damage to the insured claimant,
   (d) attaching or created subsequent to Date of Policy, or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.
4. Any claim, which arises out of the transaction vesting in the Insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (i) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer, or
   (ii) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure
      (a) to timely record the instrument of transfer, or
      (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

## 9. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY - 1992 WITH REGIONAL EXCEPTIONS

When the American Land Title Association policy is used as a Standard Coverage Policy end not as an Extended Coverage Policy the exclusions set forth in paragraph 8 above are used and the following exceptions to coverage appear in the policy.

## SCHEDULE B

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of
Part One:
1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof
3. Easements, claims of easement or encumbrances which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records.
5. Unpatented mining claims, reservations or exceptions in patents or in Acts authorizing the issuance thereof: water rights, claims or title to water,
6. Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records.

## 10. AMERICAN LAND TITLE ASSOCIATION RESIDENTIAL TITLE INSURANCE POLICY - 1987
### EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees and expenses resulting from:
1. Governmental police power, and the existence or violation of any law or government regulation. This includes building and zoning ordinances and also laws and regulations concerning:
   · land use              · land division
   · improvements on the land     · environmental protection
   This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at Policy Date.
   This exclusion does not limit the zoning coverage described in Items 12 and 13 of Covered Title Risks.
2. The right to take the land by condemning it, unless:
   · a notice of exercising the right appears in the public records on the Policy Date
   · the taking happened prior to the Policy Date and is binding on you if you bought the land without knowing of the taking.
3. Title Risks:
   · that are created, allowed, or agreed to by you
   · that are known to you, but not to us, on the Policy Date - unless they appeared in the public records
   · that result in no loss to you
   · that first affect your title after the Policy Date - this does not limit the labor and material lien coverage in Item 8 of Covered Title Risks
   ·ailure to pay value for your title.
-  -ack of a right:
      · to any land outside the area specifically described and referred to in Item 3 of Schedule A, or
      · in streets, alleys, or waterways that touch your land
   This exclusion does not limit the access coverage in Item 5 of Covered Title Risks.

Form No. 1491.EAGLE (10/98)

## ADDENDUM TO EXHIBIT B
## LIST OF PRINTED EXCEPTIONS AND EXCLUSIONS (By Policy Type)

### 11. EAGLE PROTECTION OWNER'S POLICY

### CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE - 1998
### ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE - 1998

#### EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes ordinances, laws and regulations concerning:
   a.   building
   b.   zoning
   c.   land use
   d.   improvements on the Land
   e.   land division
   f.   environmental protection

   This Exclusion does not apply to violations or the enforcement of these matters if notice of the violation or enforcement appears in the Public Records at the Policy Date.
   This Exclusion does not limit the coverage described in Covered Risk 14, 15, 16, 17 or 24.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at the Policy Date.

3. The right to take the Land by condemning it, unless:
   a.   a notice of exercising the right appears in the Public Records at the Policy Date; or
   b.   the taking happened before the Policy Date and is binding on You if You bought the Land without Knowing of the taking.

4. Risks:
   a.   that are created, allowed, or agreed to by You, whether or not they appear in the Public Records;
   b.   that are Known to You at the Policy Date, but not to Us, unless they appear in the Public Records at the Policy Date;
   ^   that result in no loss to You; or
       that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.d, 22, 23, 24 or 25.

5. Failure to pay value for Your Title.

6. Lack of a right:
   a.   to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b.   in streets, alleys, or waterways that touch the Land
   This Exclusion does not limit the coverage described in Covered Risk 11 or 18.

### 12. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1992 WITH A.L.T.A. ENDORSEMENT FORM 1 COVERAGE WITH EAGLE PROTECTION ADDED

#### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
1. (a)   Any law, ordinance or governmental regulation (including but not limited to building end zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the Land; (iii) a separation in ownership or a change in the dimensions or area of the Land or any parcel of which the Land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under insuring provisions 14, 15, 16 and 24 of this policy.

   (b)   Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under insuring provisions 14, 15, 16 and 24 of this policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the Public Records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without Knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

   (a) created, suffered, assumed or agreed to by the Insured Claimant;

   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claiment prior to the date the Insured Claimant became an Insured under this policy;

   (c) resulting in no loss or damage to the Insured Claimant;

   (d) attaching or created subsequent to Date of Policy (this paragraph (d) does not limit the coverage provided under insuring provisions 7, 8, 16, 17, 19, 20, 21, 23, 24 and 25); or

.:sulting in loss or damage which would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of the Insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the Land is situated.

5.  Invalidity or unenforceability of the lien of the Insured Mortgage, or claim thereof, which arises out of the transaction evidenced by the Insured Mortgage and is based upon:

    (a) usury, except as provided under insuring provision 10 of this policy; or

    (b) any consumer credit protection or truth in lending law.

6.  Taxes or assessments of any taxing or assessment authority which become a lien on the Land subsequent to Date of Policy.

7.  Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:

    (a)  the transaction creating the interest of the Insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or

    (b)  the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or

    (c)  the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
         (i) to timely record the instrument of transfer; or
         (ii) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

8.  Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This exclusion does not limit the coverage provided under insuring provision 7.

9.  Lack of priority of the lien of the Insured Mortgage as to each and every advance made after Date of Policy, and all interest charged thereon, over liens, encumbrances and other matters affecting title, the existence of which are Known to the Insured at:

    (a)  The time of the advance; or

    (b)  The time a modification is made to the terms of the Insured Mortgage which changes the rate of interest charged, if the rate of interest is greater as a result of the modification than it would have been before the modification.

    This exclusion does not limit the coverage provided under insuring provision 7.

### SCHEDULE B

T... .olicy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  Environmental protection liens provided for by the following existing statutes, which liens will have priority over the lien of the Insured Mortgage when they arise: NONE.

## 13. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1992
## WITH EAGLE PROTECTION ADDED
## WITH REGIONAL EXCEPTIONS

When the American Land Title Association loan policy with EAGLE Protection Added is used as a Standard Coverage Policy and not as an Extended Coverage Policy the exclusions set forth in paragraph 12 above are used and the following exceptions to coverage appear in the policy:

### SCHEDULE B

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

Part One:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.

2.  Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.

3.  Easements, claims of easement or encumbrances which are not shown by the public records.

4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records.

5.  Unpatented mining claims; reservations or exceptions in patents or in acts authorizing the issuance thereof; water rights, claims or title to water.

6.  Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records.

Part Two:

1.  Environmental protection liens provided for by the following existing statutes, which liens will have priority over the lien of the Insured Mortgage when they arise: NONE

**GUARANTEE**



*First American Title Insurance Company*

**RECORD OWNER GUARANTEE**

## SCHEDULE A

YOUR REFERENCE NO.                              LIABILITY: **$1,000.00**
OUR ORDER NO. **15192778-136**                  FEE: **$575.00**
DATE:  June 8, 2006

The assurances referred to on the face page are:

Acacia Corporate Management LLC

That, according to the Company's property records relative to the following described real property (but without examination of those Company records maintained and indexed by name):

    SEE SCHEDULE "C" ATTACHED HERETO AND MADE A PART HEREOF

The last recorded instrument purporting to transfer title to said real property is:

**For Parcel 1: Deed recorded December 5, 2005 , as instrument no. 0205336626 of Official Records**
**For Parcels 2 & 2A : Deed recorded December 5, 2005, , as instrument no. 0205336625 of Official Records**
**For Parcels 3, 3A & 3B: Deed recorded December 5, 2005 , as instrument no. 0205336624 of Official Records**

Documentary Transfer tax $330.00 for Parcel 1, $330.00 for Parcels 2 & 2A & $330.00 for Parcels 3, 3A & 3B

If information was requested by reference to street address, no guarantee is made that said real property is the same as said address.

CLTA Guarantee Form No. 15 (9-12-68)

fcowngua (rev.42597)

# Alliance Title

Order No: **15192778136**

## Parcel 1:

1.    A document recorded October 2, 1996 , as instrument no. 0196128341 of Official Records.

From:    Reinhilde H. Schwartz, an unmarried woman
To:    Steve Booth, Trustee of the Aligned Enterprises Trust dated June 15, 1995

2.    A document recorded July 28, 2000 , as instrument no. 0200091060 of Official Records.

From:    Trustee/Fiduciary of an existing Agreement, dated June 16, 2000, known as Aligned Enterprises, whose Trustees were V. Steven Booth and Lpuise Q. Booth
To:    Tomas B. Rios and Loren MeCan, as new Trustee/Fiduciary, effective May 1, 2000 of the Aligned Enterprises

3.    A document recorded January 11, 2002 , as instrument no. 0202005144 of Official Records.

From:    Aligned Enterprises, whose Trustees are Tomas B. Rios and Loren McCan
To:    Bakersfield Properties and Trust Company

4.    A document recorded December 5, 2005 , as instrument no. 020336626 of Official Records.

From:    Jean Liascos, Trustee for the benefit of Bakersfield Properties & Trust Company
To:    Acacia Corporate Management, LLC., a Nevada Limited Liability Company

## Parcel 2 & 2A :

5.    A document recorded December 29, 1994 , as instrument no. 183279 of Official Records.

From:    Douglas K. Carriger and Marjorie S. Carriger, husband and wife
To:    V. Steven Booth and Louise Booth, husband and wife as joint tenants

6.    A document recorded July 16, 1996 , as instrument no. 0196089980 of Official Records.

From:    Louise Q. Booth
To:    V. Steven Booth

7.    A document recorded July 22, 1996 , as instrument no. 0196092481 of Official Records.

From:    V. Steven Booth
To:    Alpha Omega Trust, Louise Q. Booth, Trustee

8.    A document recorded July 28, 2000 , as instrument no. 0200091059 of Official Records.

From:    Trustee/Fiduciary of an existing Trust Agreement dated June 16, 2000, known as Alpha Omega Trust, whose Trustees were V. Steven Booth and Louise Q. Booth
To:    Tomas B. Rios and Loren McCan, as the new Trustee/Fiduciary, effective May 1, 2000 of the Alpha Omega Trust

## EXHIBIT B

9.      A document recorded January 11, 2002 , as instrument no. 0202005145 of Official Records.

From:   Alpha Omega Trust, whose trustees are Tomas B. Rios and Loren McCan
To:     Bakersfield Properties and Trust Company

10.     A document recorded December 5, 2005 , as instrument no. 0205336625 of Official Records.

From:   Jean Liascos, Trustee for the benefit of Bakersfield Properties & Trust Company
To:     Acacia Corporate Management, LLC., a Nevada Limited Liability Company

## Parcel 3, 3A & 3B :

11.     A document recorded December 9, 1986 in Book 5945 Page(s) 2397 , as instrument no. 072921 of Official Records.

From:   Lakeside Golf Course Partners, a limited partnership
To:     Steven Booth, a single man

12.     A document recorded July 22, 1996 , as instrument no. 0196092481 of Official Records.

From:   V. Steven Booth
To:     Alpha Omega Trust, Louise Q, Booth, Trustee

13.     A document recorded July 28, 2000 , as instrument no. 0200091061 of Official Records.

From:   Trustee/Fiduciary of an existing Trust Agreement, dated June 16, 2000 of the Alpha Omega Trust
To:     Tomas B. Rios and Loren MeCan, as the new Trustee/Fiduciary of an existing Trust Agreement, dated
        June 16, 2000 of the Alpha Omega Trust

14.     A document recorded January 11, 2002 , as instrument no. 0202005143 of Official Records.

From:   Alpha Omega Trust, whose Trustees are Tomas B. Rios and Loren McCan
To:     Bakersfield Properties and Trust Company

15.     A document recorded December 5, 2005 , as instrument no. 0205336625 of Official Records.

From:   Jean Liascos, Trustee for the benefit of Bakersfield Properties & Trust Company
To:     Acacia Corporate Management, LLC., a Nevada Limited Liability Company

All that certain real property in the County of KERN, State of California, described as follows:

Parcel 1: (APN.: 003-241-05)

Lots 11 and 12 in Block 201 of City of Bakersfield, County of Kern, State of California, as per map recorded November 25, 1898 in Book 1 Page(s) 13 and 14 of Maps, in the Office of the County Recorder of said County.

Parcel 2: (APN.: 386-140-08)

Lot 29 of Tract No. 3817, in the City of Bakersfield, County of Kern, State of California, as per map recorded October 25, 1976 in Book 26 Page(s) 151, 152 and 153 of Maps, in the Office of the County Recorder of said County.

Parcel 2A;

A non-exclusive easement to use Lots 52 and 68 as depicted on the map for ingress, egress, open space and drainage purposes.

Except therefrom all oil, gas, minerals and other hydrocarbon substances lying below the surface of said land, but with no right of surface entry, as provided in deeds of record.

Parcel 3: (APN.: 387-180-06)

Lot 4 of Tract No. 4578, Unit B, in the City of Bakersfield, County of Kern, State of California, as per map recorded April 11, 1984 in Book 33 Page(s) 66 and 67 of Maps, in the Office of the County Recorder of said County.

Except therefrom all oil, gas, minerals and other hydrocarbon substances lying below the surface of said land, but with no right of surface entry, as provided in deeds of record.

Parcel 3A:

A non-exclusive easement for ingress, egress and road purpose on, over and across the following described property:

All that portion of Section 14, Township 29 South, Range 29 East, Mount Diablo Base and Meridian , in the City of Bakersfield, County of Kern, State of California, according to the Official Plat thereof , being more particularly described as follows:

Commencing at the Northwest corner of said Section 14; Thence South 00°03'20" West on and along the West line of said Section 14, a distance of 2490.34 feet; Thence South 79°20'56" East, 24.18 feet; Thence North 42°12'28" East, 18.18 feet; Thence North 08°27'33" East, 4.50 feet to the true point of beginning ; Thence (1) South 81°32'27" East, 35.81 feet; Thence (2) South 36°32'27" East, 5.66 feet; Thence (3) South 81°32'27" East,

26.00 feet; Thence (4) South 36°32'27" East; Thence (5) South 81°32'27" East, 45.00 feet; Thence (6) North 53°27'33" East, 16.97 feet; Thence (7) South 81°32'27" East, 108.01 feet to the beginning of a tangent Curve concave to the South having a radius of 100.00 feet; Thence (8) Easterly on and along said curve through a central angle of 13°25'55", an arc distance of 23.44 feet to the beginning of a tangent reverse curve concave to the North having a radius of 766.00 feet; Thence (9) Easterly on and along said curve through a central angle of 36°24'58", an arc distance of 486.86 feet; Thence (10) North 75°28'58" East, 4603 feet to the beginning of a tangent curve concave to the South having a radius of 384.00 feet; Thence (11) Easterly on and along said curve through a central angle of 28°41'30", an arc distance of 192.29 feet; Thence (12) South 75°50'00" East, 46.04 feet to the beginning of a tangent curve concave to the Southwest having a radius of 334.00 feet; Thence (13) Southeasterly on and along said curve through a central angle of 77°22'30", an arc distance of 451.05 feet; Thence (14) South 01°32'30" West, 175.00 feet to the beginning of a tangent curve concave to the Northeast having a radius of 916.00 feet; Thence (15) Southeasterly on and along said curve through a central angle of 29°13'30", an arc distance of 467.23 feet; Thence (16) South 27°41'00" East, 107.84 feet to the beginning of a tangent curve concave to the Northeast having a radius of 416.00 feet ; Thence (17) Southwesterly on and along said curve through a central angle of 54°26'35", an arc distance of 395.29 feet; Thence (18) South 82°07'35" East, 326.44 feet to the beginning of a tangent curve concave to the North having a radius of 291.00 feet; Thence (19) Southeasterly on and along said curve through a central angle of 43°20'39", an arc distance of 220.14 feet; Thence (20) North 54°31'46", 46.86 feet to the beginning of a tangent curve concave to the Southeast having a radius of 257.00 feet; Thence (21) Northeasterly on and along said curve through a central angle of 08°58'27", an arc distance of 40.25 feet to the beginning of a tangent reverse curve concave to the Northwest having a radius of 600.00 feet; Thence (22) Northeasterly on and along said curve through a central angle of 01°03'14", an arc distance of 11.04 feet to the beginning of a tangent reverse curve concave to the Southeast having a radius of 200.00 feet; Thence (23) Easterly on and along said curve through a central angle of 15°29'49", an arc distance of 54.09 feet to the beginning of a compound curve concave to the South having a radius of 259.00 feet; Thence (24) Easterly on and along said curve through a central angle of 41°50'06", an arc distance of 189.11 feet to the beginning of a compound curve concave to the Southwest having a radius of 200.00 feet; Thence )25) Southeasterly on and along said curve through a central angle of 15°29'49", an arc distance of 54.09 feet to the beginning of a reverse curve concave to the Northeast having a radius of 600.00 feet; Thence (26) Southeasterly on and along said curve through a central angle 01°03'14", an arc distance of 11.04 feet to the beginning of reverse curve concave to the Southwest having a radius of 257.00 feet; Thence (27) Southeasterly on and along said curve through a central angle of 05°25'01", an arc distance of 24.30 feet; Thence (28) South 40°21'30" East, 5.85 feet to the beginning of a tangent curve concave to the West having a radius of 20.00 feet; Thence (29) Southerly on and along said curve through a central angle 84°41'42", an arc distance of 29.59 feet to a point of cusp with a curve concave to the Southeast having a radius of 391.00 feet and to which point a radial line bears North 45°39'48" West; Thence (30) Northeasterly on and along said curve through a central angle of 05°18'18", an arc distance of 36.20 feet; Thence (31) North 49°38'30" East, 38.00 feet to a point of cusp with a curve concave to the North having a radius of 20.00 feet and to which point a radial line radial line bears North 40°21'30" West; Thence (32) Northeasterly on and along said curve

through a central angle of 90°00'00", an arc distance of 31.42 feet; Thence (33) North 40121'30" West, 4.09 feet to the beginning of a tangent curve concave to the Southwest having a radius of 293.00 feet; Thence (34) Northwesterly on and along said curve through a central angle of 05°25'01", an arc distance of 27.70 feet to the beginning of a compound curve to the Southwest having a radius of 200.00 feet; Thence (35) Northwesterly on and along said curve through a central angle of 12°34'21", an arc distance of 43.89 feet to the beginning of a tangent reverse curve concave to the Northeast having a radius of 600.00 feet whose radial bears North 31°39'08" East; Thence (36) Northeasterly on and along said curve through a central angle of 01°18'07", an arc distance of 13.63 feet to the beginning of a tangent reverse concave to the Southwest having a radius of 291.00 feet; Thence (37) Northwesterly on and along said curve through a central angle of 05°25'56", an arc distance of 27.59 feet; Thence (38) North 27°31'19" East, 0.50 feet to the beginning of a non-tangent curve concave to the Southwest having a radius of 291.50 feet whose radial bears South 27°31'19" West; Thence (39) Northwesterly on and along said curve through a central angle of 28°50'11", an arc distance of 146.71 feet; Thence (40) South 85°19'12" West, 15.07 feet to the beginning of a non0tangent curve concave to the Southwest having a radius of 291.00 feet whose radial bears South 04°16'41" East; Thence (41) Westerly on and along said curve through a central angle of 10°56'52", an arc distance of 55.00 feet to the beginning of a tangent reverse curve concave to the Northwest having a radius of 600.00 feet; Thence (42) Southwesterly on and along said curve through a central angle of 01°18'07" , an arc distance of 13.63 feet to the beginning of a tangent reverse curve concave to the Southeast having a radius of 200.00 feet; Thence (43) Southwesterly on and along said curve through a central angle of 12°34'21", an arc distance of 43.89 feet to the beginning of a compound curve concave to the Southeast having a radius of 293.00 feet; Thence (44) Southwesterly on and along said curve through a central angle of 15°30'47", an arc distance of 79.33 feet to the beginning of a tangent reverse curve concave to the Northeast havinga radius of 201.54 feet; Thence (45) Southwesterly on and along said curve through a central angle of 16°00'34", an arc distance of 56.31 feet to the beginning of a compound curve concave ti the Northwest having a radius of 259.00 feet whose radial bears South 26°00'00" East; Thence (46) Westerly on and along said curve through a central angle of 33°52'25", an arc distance of 153.12 feet; Thence (47) North 82°07'35" West, 326.44 feet to the beginning of a tangent curve concave to the Northeast having a radius of 384.00 feet; Thence (48) Northwesterly on and along said curve through a central angle of  54°26'35", an arc distance of 364.88 feet; Thence (48) North 27°41'00" West, 107.84 feet to the beginning of a tangent curve concave to the Northeast having a radius of 884.00 feet; Thence (50) Northwesterly on and along said curve through a central angle of 29°13'30", an arc distance of 450.00 feet; Thence (51) North 01°32'30" East, 175.00 to the beginning of a tangent curve concave to the Southwest having a radius of 366.00 feet; Thence (52) Northwesterly on and along said curve through a central angle 77°22'30", an arc distance of 494.26 feet; Thence (53) North 75°50'00" West, 46.04 feet to the beginning of a tangent curve concave to the South having a radius of 416.00 feet; Thence (54) Westerly on and along said curve through a central angle of 28°41'30", an arc distance of 208.32 feet; Thence (55) South 75°28'30" West, 46.04 feet to the beginning of a tangent curve concave to the North havinga radius of 734.00 feet; Thence (56) Westerly on and along said curve through a central angle of 37°57'55", an arc distance of 486.36 feet; Thence (57) North 66°33'35" West, 74.82 feet to the beginning of a tangent curve to the Southwest having a radius of 100.00 feet; Thence (58) Westerly on and along

said curve through a central angle of 14°58'52", an arc distance of 26.15 feet; Thence (59) North 81°32'27" West, 21.31 feet; Thence (60) North 36°32'27" West, 16.97 feet; Thence (61) North 81°32'27" West, 45.00 feet; Thence (62) South 53°27'33" West, 11.31 feet; Thence (63) North 81°32'27" West, 26.00 feet; Thence (64) South 53°27'33" West, 5.66 feet; Thence (65) North 81°32'27" West, 35.81 feet; Thence (66) South 08°27'33" West, 56.00 feet to the true point of beginning

Parcel No. 3B:

A non-exclusive easement appurtenant to Parcel 3 for access, side yard, encroachment, repairs, replacement, maintenance, overhang, drainage, landscaping, recreation and similar purposes, as defined in Section 2 of the "Declaration of Covenants, Conditions and Restrictions Establishing A Planned Residential Development for Rio Bravo Fairway, Tract 4578", recorded October 11, 1984 in Book 5701 Page(s) 627 of Official Records

**RECORD OWNER GUARANTEE**



# SCHEDULE A

YOUR REFERENCE NO.                                   LIABILITY: **$1,000.00**
OUR ORDER NO. **15192778-136**                        FEE: **$575.00**
DATE: June 8, 2006

The assurances referred to on the face page are:

Acacia Corporate Management LLC

That, according to the Company's property records relative to the following described real property (but without examination of those Company records maintained and indexed by name):

    SEE SCHEDULE "C" ATTACHED HERETO AND MADE A PART HEREOF

The last recorded instrument purporting to transfer title to said real property is:

**For Parcel 1: Deed recorded December 5, 2005 , as instrument no. 0205336626 of Official Records**
**For Parcels 2 & 2A : Deed recorded December 5, 2005, , as instrument no. 0205336625 of Official Records**
**For Parcels 3, 3A & 3B: Deed recorded December 5, 2005 , as instrument no. 0205336624 of Official Records**

Documentary Transfer tax **$330.00 for Parcel 1, $330.00 for Parcels 2 & 2A & $330.00 for Parcels 3, 3A & 3B**

If information was requested by reference to street address, no guarantee is made that said real property is the same as said address.

CLTA Guarantee Form No. 15 (9-12-68)

# Alliance Title

Order No: **15192778136**

## Parcel 1:

1.  A document recorded October 2, 1996 , as instrument no. 0196128341 of Official Records.

From:   Reinhilde H. Schwartz, an unmarried woman
To:     Steve Booth, Trustee of the Aligned Enterprises Trust dated June 15, 1995

2.  A document recorded July 28, 2000 , as instrument no. 0200091060 of Official Records.

From:   Trustee/Fiduciary of an existing Agreement, dated June 16, 2000, known as Aligned Enterprises, whose Trustees were V. Steven Booth and Lpuise Q. Booth
To:     Tomas B. Rios and Loren McCan, as new Trustee/Fiduciary, effective May 1, 2000 of the Aligned Enterprises

3.  A document recorded January 11, 2002 , as instrument no. 0202005144 of Official Records.

From:   Aligned Enterprises, whose Trustees are Tomas B. Rios and Loren McCan
To:     Bakersfield Properties and Trust Company

4.  A document recorded December 5, 2005 , as instrument no. 020336626 of Official Records.

From:   Jean Liascos, Trustee for the benefit of Bakersfield Properties & Trust Company
To:     Acacia Corporate Management, LLC., a Nevada Limited Liability Company

## Parcel 2 & 2A :

5.  A document recorded December 29, 1994 , as instrument no. 183279 of Official Records.

From:   Douglas K. Carriger and Marjorie S. Carriger, husband and wife
To:     V. Steven Booth and Louise Booth, husband and wife as joint tenants

6.  A document recorded July 16, 1996 , as instrument no. 0196089980 of Official Records.

From:   Louise Q. Booth
To:     V. Steven Booth

7.  A document recorded July 22, 1996 , as instrument no. 0196092481 of Official Records.

From:   V. Steven Booth
To:     Alpha Omega Trust, Louise Q. Booth, Trustee

8.  A document recorded July 28, 2000 , as instrument no. 0200091059 of Official Records.

From:   Trustee/Fiduciary of an existing Trust Agreement dated June 16, 2000, known as Alpha Omega Trust, whose Trustees were V. Steven Booth and Louise Q. Booth
To:     Tomas B. Rios and Loren McCan, as the new Trustee/Fiduciary, effective May 1, 2000 of the Alpha Omega Trust

9.     A document recorded January 11, 2002 , as instrument no. 0202005145 of Official Records.

From:    Alpha Omega Trust, whose trustees are Tomas B. Rios and Loren McCan
To:       Bakersfield Properties and Trust Company

10.    A document recorded December 5, 2005 , as instrument no. 0205336625 of Official Records.

From:    Jean Liascos, Trustee for the benefit of Bakersfield Properties & Trust Company
To:       Acacia Corporate Management, LLC., a Nevada Limited Liability Company

## Parcel 3, 3A & 3B :

11.    A document recorded December 9, 1986 in Book 5945 Page(s) 2397 , as instrument no. 072921 of Official Records.

From:    Lakeside Golf Course Partners, a limited partnership
To:       Steven Booth, a single man

12.    A document recorded July 22, 1996 , as instrument no. 0196092481  of Official Records.

From:    V. Steven Booth
To:       Alpha Omega Trust, Louise Q, Booth, Trustee

13.    A document recorded July 28, 2000 , as instrument no. 0200091061 of Official Records.

From:    Trustee/Fiduciary of an existing Trust Agreement, dated June 16, 2000 of the Alpha Omega Trust
To:       Tomas B. Rios and Loren McCan, as the new  Trustee/Fidueiary of an existing Trust Agreement, dated June 16, 2000 of the Alpha Omega Trust

14.    A document recorded January 11, 2002 , as instrument no. 0202005143 of Official Records.

From:    Alpha Omega Trust, whose Trustees are Tomas B. Rios and Loren McCan
To:       Bakersfield Properties  and Trust Company

15.    A document recorded December 5, 2005 , as instrument no. 0205336625 of Official Records.

From:    Jean Liascos, Trustee for the benefit of Bakersfield Properties & Trust Company
To:       Acacia Corporate Management, LLC., a Nevada Limited Liability Company

## SCHEDULE C

### LEGAL DESCRIPTION

**All that certain real property situ ate in the , County of Kern, CA, described as follows:**

All that certain real property in the County of KERN, State of California, described as follows:

Parcel 1: (APN.: 003-241-05)

Lots 11 and 12 in Block 201 of City of Bakersfield, County of Kern, State of California, as per map recorded November 25, 1898 in Book 1 Page(s) 13 and 14 of Maps, in the Office of the County Recorder of said County.

Parcel 2: (APN.: 386-140-08)

Lot 29 of Tract No. 3817, in the City of Bakersfield, County of Kern, State of California, as per map recorded October 25, 1976 in Book 26 Page(s) 151, 152 and 153 of Maps, in the Office of the County Recorder of said County.

Parcel 2A;

A non-exclusive easement to use Lots 52 and 68 as depicted on the map for ingress, egress, open space and drainage purposes.

Except therefrom all oil, gas, minerals and other hydrocarbon substances lying below the surface of said land, but with no right of surface entry, as provided in deeds of record.

Parcel 3: (APN.: 387-180-06)

Lot 4 of Tract No. 4578, Unit B, in the City of Bakersfield, County of Kern, State of California, as per map recorded April 11, 1984 in Book 33 Page(s) 66 and 67 of Maps, in the Office of the County Recorder of said County.

Except therefrom all oil, gas, minerals and other hydrocarbon substances lying below the surface of said land, but with no right of surface entry, as provided in deeds of record.

Parcel 3A:

A non-exclusive easement for ingress, egress and road purpose on, over and across the following described property:

## SCHEDULE C, CONTINUED

All that portion of Section 14, Township 29 South, Range 29 East, Mount Diablo Base and Meridian , in the City of Bakersfield, County of Kern, State of California, according to the Official Plat thereof , being more particularly described as follows:

Commencing at the Northwest corner of said Section 14; Thence South 00°03'20" West on and along the West line of said Section 14, a distance of 2490.34 feet; Thence South 79°20'56" East, 24.18 feet; Thence North 42°12'28" East, 18.18 feet; Thence North 08°27'33" East, 4.50 feet to the true point of beginning ; Thence (1) South 81°32'27" East, 35.81 feet; Thence (2) South 36°32'27" East, 5.66 feet; Thence (3) South 81°32'27" East, 26.00 feet; Thence (4) South 36°32'27" East; Thence (5) South 81°32'27" East, 45.00 feet; Thence (6) North 53°27'33" East, 16.97 feet; Thence (7) South 81°32'27" East, 108.01 feet to the beginning of a tangent Curve concave to the South having a radius of 100.00 feet; Thence (8) Easterly on and along said curve through a central angle of 13°25'55", an arc distance of 23.44 feet to the beginning of a tangent reverse curve concave to the North having a radius of 766.00 feet; Thence (9) Easterly on and along said curve through a central angle of 36°24'58", an arc distance of 486.86 feet; Thence (10) North 75°28'58" East, 4603 feet to the beginning of a tangent curve concave to the South having a radius of 384.00 feet; Thence (11) Easterly on and along said curve through a central angle of 28°41'30", an arc distance of 192.29 feet; Thence (12) South 75°50'00" East, 46.04 feet to the beginning of a tangent curve concave to the Southwest having a radius of 334.00 feet; Thence (13) Southeasterly on and along said curve through a central angle of 77°22'30", an arc distance of 451.05 feet; Thence (14) South 01°32'30" West, 175.00 feet to the beginning of a tangent curve concave to the Northeast having a radius of 916.00 feet; Thence (15) Southeasterly on and along said curve through a central angle of 29°13'30", an arc distance of 467.23 feet; Thence (16) South 27°41'00" East, 107.84 feet to the beginning of a tangent curve concave to the Northeast having a radius of 416.00 feet ; Thence (17) Southwesterly on and along said curve through a central angle of 54°26'35", an arc distance of 395.29 feet; Thence (18) South 82°07'35" East, 326.44 feet to the beginning of a tangent curve concave to the North having a radius of 291.00 feet; Thence (19) Southeasterly on and along said curve through a central angle of 43°20'39", an arc distance of 220.14 feet; Thence (20) North 54°31'46", 46.86 feet to the beginning of a tangent curve concave to the Southeast having a radius of 257.00 feet; Thence (21) Northeasterly on and along said curve through a central angle of 08°58'27", an arc distance of 40.25 feet to the beginning of a tangent reverse curve concave to the Northwest having a radius of 600.00 feet; Thence (22) Northeasterly on and along said curve through a central angle of 01°03'14", an arc distance of 11.04 feet to the beginning of a tangent reverse curve concave to the Southeast having a radius of 200.00 feet; Thence (23) Easterly on and along said curve through a central angle of 15°29'49", an arc distance of 54.09 feet to the beginning of a compound curve concave to the South having a radius of 259.00 feet; Thence (24) Easterly on and along said curve through a central angle of 41°50'06", an arc distance of 189.11 feet to the beginning of a compound curve concave to the Southwest having a radius of 200.00 feet; Thence )25) Southeasterly on and along said curve through a central angle of 15°29'49", an arc distance of 54.09 feet to the beginning of a reverse curve concave to the Northeast having a radius of 600.00 feet; Thence (26) Southeasterly on and along said curve through a central angle

CLTA Guarantee Form No. 15 (9-12-68)

fcowngua (rev.42597)

### SCHEDULE C, CONTINUED

01°03'14", an arc distance of 11.04 feet to the beginning of reverse curve concave to the Southwest having a radius of 257.00 feet; Thence (27) Southeasterly on and along said curve through a central angle of 05°25'01", an arc distance of 24.30 feet; Thence (28) South 40°21'30" East, 5.85 feet to the beginning of a tangent curve concave to the West having a radius of 20.00 feet; Thence (29) Southerly on and along said curve through a central angle 84°41'42", an arc distance of 29.59 feet to a point of cusp with a curve concave to the Southeast having a radius of 391.00 feet and to which point a radial line bears North 45°39'48" West; Thence (30) Northeasterly on and along said curve through a central angle of 05°18'18", an arc distance of 36.20 feet; Thence (31) North 49°38'30" East, 38.00 feet to a point of cusp with a curve concave to the North having a radius of 20.00 feet and to which point a radial line radial line bears North 40°21'30" West; Thence (32) Northeasterly on and along said curve through a central angle of 90°00'00", an arc distance of 31.42 feet; Thence (33) North 40121'30" West, 4.09 feet to the beginning of a tangent curve concave to the Southwest having a radius of 293.00 feet; Thence (34) Northwesterly on and along said curve through a central angle of 05°25'01", an arc distance of 27.70 feet to the beginning of a compound curve to the Southwest having a radius of 200.00 feet; Thence (35) Northwesterly on and along said curve through a central angle of 12°34'21", an arc distance of 43.89 feet to the beginning of a tangent reverse curve concave to the Northeast having a radius of 600.00 feet whose radial bears North 31°39'08" East; Thence (36) Northeasterly on and along said curve through a central angle of 01°18'07", an arc distance of 13.63 feet to the beginning of a tangent reverse concave to the Southwest having a radius of 291.00 feet; Thence (37) Northwesterly on and along said curve through a central angle of 05°25'56", an arc distance of 27.59 feet; Thence (38) North 27°31'19" East, 0.50 feet to the beginning of a non-tagent curve concave to the Southwest having a radius of 291.50 feet whose radial bears South 27°31'19" West; Thence (39) Northwesterly on and along said curve through a central angle of 28°50'11", an arc distance of 146.71 feet; Thence (40) South 85°19'12" West, 15.07 feet to the beginning of a non0tangent curve concave to the Southwest having a radius of 291.00 feet whose radial bears South 04°16'41" East; Thence (41) Westerly on and along said curve through a central angle of 10°56'52", an arc distance of 55.00 feet to the beginning of a tangent reverse curve concave to the Northwest having a radius of 600.00 feet; Thence (42) Southwesterly on and along said curve through a central angle of 01°18'07" , an arc distance of 13.63 feet to the beginning of a tangent reverse curve concave to the Southeast having a radius of 200.00 feet; Thence (43) Southwesterly on and along said curve through a central angle of 12°34'21", an arc distance of 43.89 feet to the beginning of a compound curve concave to the Southeast having a radius of 293.00 feet; Thence (44) Southwesterly on and along said curve through a central angle of 15°30'47", an arc distance of 79.33 feet to the beginning of a tangent reverse curve concave to the Northeast havinga radius of 201.54 feet; Thence (45) Southwesterly on and along said curve through a central angle of 16°00'34", an arc distance of 56.31 feet to the beginning of a compound curve concave ti the Northwest having a radius of 259.00 feet whose radial bears South 26°00'00" East; Thence (46) Westerly on and along said curve through a central angle of 33°52'25", an arc distance of 153.12 feet; Thence (47) North 82°07'35" West, 326.44 feet to the beginning of a tangent curve concave to the Northeast having a radius of 384.00 feet; Thence (48) Northwesterly on and along said curve through a central angle of

CLTA Guarantee Form No. 15 (9-12-68)

## SCHEDULE C, CONTINUED

54°26'35", an arc distance of 364.88 feet; Thence (48) North 27°41'00" West, 107.84 feet to the beginning of a tangent curve concave to the Northeast having a radius of 884.00 feet; Thence (50) Northwesterly on and along said curve through a central angle of 29°13'30", an arc distance of 450.00 feet; Thence (51) North 01°32'30" East, 175.00 to the beginning of a tangent curve concave to the Southwest having a radius of 366.00 feet; Thence (52) Northwesterly on and along said curve through a central angle 77°22'30", an arc distance of 494.26 feet; Thence (53) North 75°50'00" West, 46.04 feet to the beginning of a tangent curve concave to the South having a radius of 416.00 feet; Thence (54) Westerly on and along said curve through a central angle of 28°41'30", an arc distance of 208.32 feet; Thence (55) South 75°28'30" West, 46.04 feet to the beginning of a tangent curve concave to the North havinga radius of 734.00 feet; Thence (56) Westerly on and along said curve through a central angle of 37°57'55", an arc distance of 486.36 feet; Thence (57) North 66°33'35" West, 74.82 feet to the beginning of a tangent curve concave to the Southwest having a radius of 100.00 feet; Thence (58) Westerly on and along said curve through a central angle of 14°58'52", an arc distance of 26.15 feet; Thence (59) North 81°32'27" West, 21.31 feet; Thence (60) North 36°32'27" West, 16.97 feet; Thence (61) North 81°32'27" West, 45.00 feet; Thence (62) South 53°27'33" West, 11.31 feet; Thence (63) North 81°32'27" West, 26.00 feet; Thence (64) South 53°27'33" West, 5.66 feet; Thence (65) North 81°32'27" West, 35.81 feet; Thence (66) South 08°27'33" West, 56.00 feet to the true point of beginning

Parcel No. 3B:

A non-exclusive easement appurtenant to Parcel 3 for access, side yard, encroachment, repairs, replacement, maintenance, overhang, drainage, landscaping, recreation and similar purposes, as defined in Section 2 of the "Declaration of Covenants, Conditions and Restrictions Establishing A Planned Residential Development for Rio Bravo Fairway, Tract 4578", recorded October 11, 1984 in Book 5701 Page(s) 627 of Official Records